# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE[1]
September 30, 2015 Session

## STATE OF TENNESSEE v. LINZEY DANIELLE SMITH

### Appeal from the Court of Criminal Appeals
### Circuit Court for Williamson County
### No. II-CR077410     James G. Martin, III, Judge

### No. M2013-02818-SC-R11-CD – Filed February 11, 2016

We granted permission to appeal in this case to determine whether the traffic stop of the Defendant, Linzey Danielle Smith, violated the constitutional rights of the Defendant. The arresting officer initiated the stop after observing the Defendant once cross and twice touch the fog line marking the outer right lane boundary on an interstate highway. After being pulled over, the Defendant was charged with alternative counts of driving under the influence. The Defendant filed a motion to suppress, contending that the traffic stop was unconstitutional. After a hearing, the trial court denied the motion to suppress. The Defendant then pleaded guilty to driving under the influence and reserved a certified question of law regarding the legality of her traffic stop. The Court of Criminal Appeals affirmed the judgment. We hold that the traffic stop was supported by reasonable suspicion and therefore met constitutional requirements. Accordingly, we affirm the Defendant's judgment of conviction.

### Tenn. R. App. P. 11; Judgment of the
### Court of Criminal Appeals Affirmed

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which SHARON G. LEE, C.J., and CORNELIA A. CLARK and HOLLY KIRBY, JJ., joined.

Patrick B. Newsom, Nashville, Tennessee, for the appellant, Linzey Danielle Smith.

Herbert H. Slatery III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General; Leslie E. Price, Senior Counsel; Kim R. Helper, District Attorney General; and Carlin Hess, Assistant District Attorney, for the appellee, the State of Tennessee.

---

[1]     We heard oral argument in this case on September 30, 2015, at Cumberland University in Lebanon, Tennessee, as part of the S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

# OPINION

## Factual and Procedural History

The Defendant was charged in July 2013 with two alternative counts of driving under the influence. The Defendant filed a motion to suppress on the basis that her traffic stop was unconstitutional. At the ensuing hearing, held in October 2013, the following proof was adduced:

Trooper Chuck Achinger of the Tennessee Highway Patrol testified that, at approximately 3:00 a.m. on December 6, 2012, he was travelling north on I-65 in Williamson County, Tennessee. As he neared the 72 mile marker, he noticed a car in front of him "drift over towards the shoulder" as it entered a "big swooping curve." He then observed the vehicle cross the fog line[2] "by less than six inches, probably." As the car came out of the curve, "it corrected itself back into its lane, and then it drifted back over to the right and almost went all the way over the fog line again. It corrected itself. And then, again, it went back over and just barely touched the fog line again." Trooper Achinger clarified that, when the car crossed the fog line, both tires on the right side of the car crossed the line "[e]ntirely." Trooper Achinger observed this driving behavior over the course of four to five tenths of a mile. He acknowledged that the Defendant's driving did not endanger any other vehicles.

Trooper Achinger continued to follow the car for approximately two more miles and observed no further driving infractions. Nevertheless, he stopped the vehicle after it exited the interstate. He testified that he stopped the driver because she failed to maintain her lane of travel as required by Tennessee Code Annotated section 55-8-123.

Trooper Achinger testified that he video-recorded the car as he followed it, but the video did not record the fog line crossing because the camera was "zoomed in" to the extent that, during the curve, it was "facing off into the distance." The video recording was admitted into evidence and accords with Trooper Achinger's testimony.

The trial court accredited Trooper Achinger's testimony and determined that he had probable cause to stop the Defendant based on his observation of the car crossing the fog line, thereby violating Tennessee Code Annotated section 55-8-123. Accordingly, the trial court denied the Defendant's motion to suppress. The Defendant subsequently pleaded guilty to one count of driving under the influence and reserved the following certified question of law:

---

[2]     This Court has used the term "fog line" to describe the line painted on a roadway to define its edge. See Helton v. Knox Cnty., Tenn., 922 S.W.2d 877, 880 (Tenn. 1996).

2

Whether the stop of Defendant's vehicle by trooper Charles C. Achinger of Tennessee Highway Patrol on December 6th, 2012, violated Defendant's rights granted pursuant to the Fourth Amendment to the U.S. Constitution and Article I, Section[] 7 of the Tennessee Constitution and whether any evidence, statements and blood tests obtained as a result of said stop should be suppressed as the fruits of an unconstitutional seizure, due to the fact that there was no probable cause that a traffic violation ha[d] been committed under Tenn. Code Ann. § 55-8-231(1), and there was no reasonable suspicion based on the totality of the circumstances, where Defendant was observed driving on a winding and sloping portion of a roadway for a distance of approximately 2.5 miles.

The Court of Criminal Appeals affirmed the trial court's judgment on the merits, with one judge dissenting. See State v. Smith, No. M2013-02818-CCA-R3-CD, 2015 WL 412972, at *9 (Tenn. Crim. App. Feb. 2, 2015). We subsequently granted the Defendant's application for permission to appeal.

## Standard of Review

We will uphold a trial court's findings of fact at a suppression hearing unless the evidence preponderates to the contrary. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Id. "We afford to the party prevailing in the trial court the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). As to the trial court's application of the law to the facts, however, we apply a de novo standard of review. Id.

## Analysis

*Warrantless Seizures*

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no [w]arrants shall issue, but upon probable cause." U.S. Const. amend. IV. "The purpose of the prohibition against unreasonable searches and seizures under the Fourth Amendment is to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997) (quoting Camara v. Municipal Court, 387 U.S. 523, 528 (1967)).

3

Likewise, Article I, Section 7 of the Tennessee Constitution provides that "the people shall be secure in their persons . . . from unreasonable searches and seizures." Tenn. Const. art. I, § 7. This Court has stated that the Tennessee Constitution's search and seizure provision "is identical in intent and purpose with the Fourth Amendment." Sneed v. State, 423 S.W.2d 857, 860 (Tenn. 1968); see also, e.g., State v. Scarborough, 201 S.W.3d 607, 622 (Tenn. 2006). Accordingly, "under both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." Yeargan, 958 S.W.2d at 629 (citing Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971); State v. Bartram, 925 S.W.2d 227, 229-30 (Tenn. 1996)).

Individuals do not lose their constitutional protections against unreasonable searches and seizures by getting into an automobile. See Delaware v. Prouse, 440 U.S. 648, 662-63 (1979). Therefore, when a police officer seizes a motorist by turning on his blue lights in order to pull the motorist over, the stop must pass constitutional muster. See State v. Pulley, 863 S.W.2d 29, 30 (Tenn. 1993). The reasonableness of such seizures, and therefore their legality, "depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975) (citing Terry v. Ohio, 392 U.S. 1, 20-21 (1968); Camara, 387 U.S. at 536-37).

*Probable Cause and Reasonable Suspicion*

A police officer's traffic stop of a motorist will pass constitutional muster if the officer has "probable cause" to believe that the motorist has committed a traffic offense. See State v. Vineyard, 958 S.W.2d 730, 736 (Tenn. 1997) (holding that officers' observation of defendant's violations of traffic laws created probable cause to stop defendant); see also United States v. Barry, 98 F.3d 373, 376 (8th Cir. 1996) (recognizing that even minor traffic violations create probable cause to stop the driver); State v. Berrios, 235 S.W.3d 99, 105 (Tenn. 2007) (recognizing that, "[a]s a general rule, if the police have probable cause to believe a traffic violation has occurred, the stop is constitutionally reasonable" (citing Whren v. United States, 517 U.S. 806, 810 (1996))). "Articulating precisely what . . . 'probable cause' mean[s] is not possible." Ornelas v. United States, 517 U.S. 690, 695 (1996). Rather, probable cause is a "practical, nontechnical" concept. State v. Jacumin, 778 S.W.2d 430, 432 (Tenn. 1989) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)). As we recently reiterated, "probable cause exists when 'at the time of the [seizure], the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are sufficient to warrant a prudent person in believing that the defendant had committed or

4

was committing an offense.'" State v. Dotson, 450 S.W.3d 1, 50 (Tenn. 2014) (quoting State v. Echols, 382 S.W.3d 266, 277-78 (Tenn. 2012)).

Many of our traffic statutes create offenses which render it simple for an officer to determine whether a motorist has committed a violation. For instance, Tennessee Code Annotated section 55-8-149 renders it an offense to run a stop sign "except when directed to proceed by a police officer or traffic control signal." Tenn. Code Ann. § 55-8-149(c) (2012). Likewise, it is an offense for a motorist to exceed the applicable speed limit. See id. § 55-8-152 (2012). When a police officer sees a motorist commit such an offense, the officer will have probable cause to stop the motorist. Accordingly, if a police officer sees a driver run a red light, or clocks a driver speeding, the officer's stop of the motorist will pass constitutional muster. See, e.g., United States v. Winters, 782 F.3d 289, 296 (6th Cir. 2015) (holding that, because officer witnessed defendant driving 72 miles per hour in a 55 mile-per-hour zone, officer "had probable cause to believe that a traffic violation was occurring"). Under such circumstances, no further investigation is necessary and the police officer is justified in issuing a citation.

Some driving conduct, however, may or may not constitute a traffic offense. For instance, a police officer patrolling late at night may observe a driver weaving within her own lane of travel, driving below the speed limit, and engaging in prolonged delays at four-way-stop intersections in spite of the absence of any other traffic. While this driving behavior may not violate any of our "rules of the road" statutes, see Tenn. Code Ann. §§ 55-8-101 through 55-8-199 (2012), under these circumstances, the officer may suspect that the motorist is intoxicated. When an officer merely *suspects* a driving offense, but needs to investigate further in order to discern whether the driver, in fact, is committing the offense, a different constitutional standard for stopping the motorist is implicated.[3]

If a police officer lacks probable cause to seize a motorist, he nevertheless may legitimately initiate a brief, investigatory traffic stop if he possesses a "reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000) (citing Terry, 392 U.S. at 20-21; State v. Bridges, 963 S.W.2d 487, 492 (Tenn. 1997)). Unlike

---

[3] We caution that slight weaving within one's lane ordinarily will not support a stop under any standard. See State v. Binette, 33 S.W.3d 215, 219-20 (Tenn. 2000) (holding that officer did not have grounds to stop, on suspicion of DUI, a motorist who wove slightly within her own lane and whose left tires merely touched the center lane line); see also United States v. Gregory, 79 F.3d 973, 978-79 (10th Cir. 1996) (recognizing that, "[i]f failure to follow a perfect vector down the highway or keeping one's eyes on the road were sufficient reasons to suspect a person of driving while impaired, a substantial portion of the public would be subject each day to an invasion of their privacy" (quoting United States v. Lyons, 7 F.3d 973, 976 (10th Cir. 1993)) (internal quotation marks omitted)). We further caution that the driving behavior described in our hypothetical will not necessarily provide a constitutional basis to seize a driver.

the examples above in which a police officer has probable cause to stop a motorist in order to issue a citation, reasonable suspicion stops are *investigatory* in nature.

"The level of reasonable suspicion required to support an investigatory stop is lower than that required for probable cause." State v. Day, 263 S.W.3d 891, 902 (Tenn. 2008) (citing Alabama v. White, 496 U.S. 325, 330 (1990); Pulley, 863 S.W.2d at 31)). Nevertheless, "[r]easonable suspicion is a *particularized and objective basis* for suspecting the subject of a stop of criminal activity," Binette, 33 S.W.3d at 218 (emphasis added) (citing Ornelas, 517 U.S. at 696), and must be "something more than the officer's 'inchoate and unparticularized suspicion or hunch,'" Day, 263 S.W.3d at 902 (quoting Terry, 392 U.S. at 27). Accordingly, "[i]n determining whether an investigatory detention is based upon reasonable suspicion, we engage in a fact-intensive and objective analysis, reviewing the record for specific and articulable facts, that the defendant had committed, or was about to commit, a criminal offense." State v. Hanning, 296 S.W.3d 44, 49 (Tenn. 2009) (internal quotation marks omitted); see also Day, 263 S.W.3d at 903 (recognizing that "a court must consider the totality of the circumstances when determining whether a police officer's reasonable suspicion is supported by specific and articulable facts" (citing White, 496 U.S. at 330)).

"The evaluation [of reasonable suspicion] is made from the perspective of the reasonable *officer*, not the reasonable *person*." United States v. Quintana-Garcia, 343 F.3d 1266, 1270 (10th Cir. 2003); see also United States v. Valdez, 147 Fed. Appx. 591, 596 (6th Cir. 2005). Moreover, because a court reviews the validity of a stop from a purely objective perspective, the officer's subjective state of mind is irrelevant, see Brigham City, Utah v. Stuart, 547 U.S. 398, 404 (2006), and the court may consider relevant circumstances demonstrated by the proof even if not articulated by the testifying officer as reasons for the stop, see City of Highland Park v. Kane, 991 N.E.2d 333, 338 (Ill. App. Ct. 2013) (recognizing that, "[i]n analyzing whether a stop was proper, a court is not limited to bases cited by the officer for effectuating the stop" (citing Whren, 517 U.S. at 813)); see also State v. Huddleston, 924 S.W.2d 666, 676 (Tenn. 1996) (recognizing that an officer's "subjective belief that he did not have enough evidence to obtain a warrant is irrelevant to whether or not probable cause actually existed"). Additionally, if the defendant attempts to suppress evidence collected during the challenged stop, the state is not limited in its opposing argument to the grounds ostensibly relied upon by the officer if the proof supports the stop on other grounds. See State v. Tague, 676 N.W.2d 197, 201 (Iowa 2004).

6

*Tennessee Code Annotated Section 55-8-123*

In State v. Davis, released simultaneously with this case, this Court determined that Tennessee Code Annotated section 55-8-115(a)[4] creates an offense that is committed when a driver crosses the center lane line(s) of a roadway on even one occasion, unless the crossing is made pursuant to one of the specific exceptions set forth in the statute. See State v. Davis, No. E2013-02073-SC-R11-CD, __ S.W.3d __, __, ___ WL _____, at *__ (Tenn. 2016). Whether or not a motorist violates section 55-8-115(a) can be discerned from simple observation. Thus, for the reasons set forth above, if a police officer sees a motorist drive across a double yellow line dividing the lanes of traffic on a two-lane road, and the motorist did not do so in accord with one of the statutory exceptions, the officer will have *probable cause* to stop the motorist. See id. at *__.

In contrast, the traffic statute at issue in this case, Tennessee Code Annotated section 55-8-123, provides, in pertinent part, as follows:

> Whenever any roadway has been divided into two (2) or more clearly marked lanes for traffic, the following rules, in addition to all others consistent with this section, shall apply:
>
> (1) A vehicle shall be driven *as nearly as practicable* entirely within a single lane *and* shall not be moved from that lane *until the driver has first ascertained* that the movement can be made with safety[.]

---

[4] Tennessee Code Annotated section 55-8-115(a) provides as follows:

> Upon all roadways of sufficient width, a vehicle shall be driven upon the right half of the roadway, except as follows:
>
> (1) When overtaking and passing another vehicle proceeding in the same direction under the rules governing such movement;
>
> (2) When the right half of a roadway is closed to traffic while under construction or repair;
>
> (3) Upon a roadway divided into three (3) marked lanes for traffic under the applicable rules thereon; or
>
> (4) Upon a roadway designated and signposted for one-way traffic.

Tenn. Code Ann. § 55-8-115(a) (2012).

Tenn. Code Ann. § 55-8-123(1) (2012) ("Section 123(1)") (emphases added).[5]  The word "practicable" is defined as "that which may be done, practiced, or accomplished; that which is performable, feasible, possible."  Black's Law Dictionary 1172 (6th ed. 1990).

In order to address whether an officer has constitutional grounds to stop a motorist for violating Section 123(1), we first must determine what, precisely, this statute prohibits.[6]  This is an issue of first impression before this Court.

The role of this Court in statutory interpretation is to assign a statute the full effect of the legislative intent without restricting or expanding the intended scope of the statute. State v. Springer, 406 S.W.3d 526, 533 (Tenn. 2013); State v. Marshall, 319 S.W.3d 558, 561 (Tenn. 2010).  In doing so, we must look to the plain language of the statute to determine the legislature's intent.  State v. Jennings, 130 S.W.3d 43, 46 (Tenn. 2004). We must presume that "every word in the statute has meaning and purpose and should be given full effect if the obvious intent of the General Assembly is not violated by so doing."  Marshall, 319 S.W.3d at 561 (quoting Larsen-Ball v. Ball, 301 S.W.3d 228, 232 (Tenn. 2010)) (internal quotation marks omitted).  When the language of a statute is clear and unambiguous, "the legislative intent shall be derived from the plain and ordinary meaning of the statutory language."  State v. Wilson, 132 S.W.3d 340, 341 (Tenn. 2004).

We begin our analysis by taking into consideration various other statutes that are related to Section 123(1).  "Roadway" is defined as "that portion of a highway improved, designed or ordinarily used for vehicular travel, *exclusive of the berm or shoulder*." Tenn. Code Ann. § 55-8-101(54) (2012) (emphasis added).  "Highway" is in turn defined as "the entire width *between the boundary lines* of every way when any part thereto is open to the use of the public for purposes of vehicular travel."  Id. § 55-8-101(24) (emphasis added).  Consistent with Section 123(1), these two provisions indicate that, as a general rule, vehicles should be driven *within* lane markers.  Additionally, Tennessee Code Annotated section 55-8-103 provides that

---

[5]     Section 123(1) was initially passed in 1955 and has remained unchanged.

[6]     Section 123(1) closely tracks a provision of the Uniform Vehicle Code:

> Whenever any roadway has been divided into two or more clearly marked lanes for traffic the following rules in addition to all others consistent herewith shall apply.  (a) A vehicle shall be driven, as nearly as practicable, entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.

Unif. Vehicle Code § 11-309(a) (2000) (as quoted in State v. Phillips, 2006 WL 3477003, at *8 n.9 (Ohio Ct. App. Dec. 4, 2006)).  All fifty states have passed legislation mirroring this provision.  See State v. Regis, 32 A.3d 1109, 1112 n.2 (N.J. 2011).

8

[i]t is unlawful and, unless otherwise declared in this chapter and chapter 10, parts 1-5 of this title with respect to particular offenses, it is a Class C misdemeanor, for any person to do any act forbidden or fail to perform any act required in this chapter and chapter 10 of this title.

Id. § 55-8-103 (2012).

Initially, we have no trouble concluding that crossing over a fog line with two of a car's four wheels is an instance of leaving one's lane of travel. However, unlike the statute at issue in Davis, Section 123(1) does not create an offense that always may be discerned simply by observation. Accord People v. Hackett, 971 N.E.2d 1058, 1066 (Ill. 2012) (stating that "it is clear that [Illinois' version of Section 123(1)] is not a strict liability offense" (citing 625 Ill. Comp. Stat. Ann. 5/11-709(a) (West 2008))); State v. Marx, 215 P.3d 601, 612 (Kan. 2009) (stating that Kansas' version of Section 123(1) "is not a strict liability offense" because the "express language employed—'as nearly as practicable'—contradicts the notion that any and all intrusions upon the marker lines of the chosen travel lane constitute a violation" (citing Kan. Stat. Ann. § 8-1522(a))). Rather, Section 123(1) contains two contingencies that impact whether crossing over a fog (or other lane) line is an offense. First, a motorist is required to remain in a single lane only so far as it is "practicable" to do so. See, e.g., Mitchell v. State, 347 P.3d 1278, 1280 (Mont. 2015) (holding that the "plain meaning" of Montana's version of Section 123(1) is that "moving from a lane of traffic is usually prohibited to the extent that it is feasible for a vehicle to be operated within the lane of traffic"). If, for instance, obstructions in the lane render it impracticable to remain in the lane, leaving the lane may be permitted. Thus, "[t]he statute clearly requires a fact-specific inquiry into the particular circumstances present during the incident to determine whether factors such as weather, obstacles, or road conditions might have necessitated [a motorist's] lane deviation." Hackett, 971 N.E.2d at 1066. Second, if remaining in a single lane becomes impracticable, the driver may leave her lane of travel only after first ascertaining that the movement can be made safely.

In construing New Jersey's virtually identical "as nearly as practicable" statute,[7] the New Jersey Supreme Court has concluded that the statute "contains two separate legal

_____

[7] New Jersey's version of Section 123(1) provides, in pertinent part, that,

[w]hen a roadway has been divided into clearly marked lanes for traffic, drivers of vehicles shall obey the following regulations: . . . A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from that lane until the driver has first ascertained that the movement can be made with safety[.]

N. J. Stat. Ann. § 39:4-88(b) (as quoted in Regis, 32 A.3d at 1112).

9

predicates directing the conduct of drivers: 'shall be driven' in the first clause and 'shall not be moved' in the second." State v. Regis, 32 A.3d 1109, 1114 (N.J. 2011). The New Jersey court continued:

> The statute's two clauses address different circumstances. The first clause imposes a continuous requirement upon the driver: to maintain his or her vehicle in a single lane, by avoiding drifting or swerving into an adjoining lane or the shoulder, unless it is not feasible to do so.
>
> . . . .
>
> Moreover, the first clause of N.J.S.A. 39:4-88(b) is not limited to circumstances in which the deviation from the lane is demonstrated to be a danger to other drivers. . . . By the terms of the first clause of N.J.S.A. 39:4-88(b), the mandate to drive within a single lane to the extent practicable applies, whether or not a deviation from that lane imposes a risk to another driver.
>
> The statute's second clause addresses a related, but discrete, mandate of the Code. It requires a driver to ascertain the safety of switching lanes before conducting a lane change. N.J.S.A. 39:4-88(b). Unlike the violation described in the first clause of N.J.S.A. 39:4-88(b), the violation described in the second clause is avoided if a driver, in a roadway with multiple lanes traveling in the same direction, first determines that departure from a lane may be conducted safely.

Id. at 1114-15 (footnote omitted).

Similarly, in construing Kansas' virtually identical "as nearly as practicable" statute,[8] the Kansas Supreme Court held as follows:

---

[8] Kansas' version of Section 123(1) provides as follows:

> Whenever any roadway has been divided into two (2) or more clearly marked lanes for traffic, the following rules in addition to all others consistent herewith shall apply.
>
> (a) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.

Kan. Stat. Ann. § 8-1522 (as quoted in Marx, 215 P.3d at 606).

> [W]e interpret K.S.A. 8-1522(a) as establishing two separate rules of the road. The first requires a driver to keep entirely within a single lane while traveling on a roadway with two or more clearly marked lanes. That rule is temporarily suspended when it becomes impracticable to stay within the lane markers and when the driver is properly effecting a lane change. . . . The second rule provides that before a driver may change lanes or move from the current lane of travel to another location, he or she must ascertain that the movement can be made with safety. A traffic infraction occurs under K.S.A. 8-1522(a) when *either* rule of the road is violated.

Marx, 215 P.3d at 612 (emphasis added); see also State v. McBroom, 39 P.3d 226, 229 (Or. Ct. App. 2002) (stating that the second provision of Oregon's version of Section 123(1) does not permit a motorist to "stray" outside his lane of travel even if the straying is accomplished safely (citing Or. Rev. Stat. § 811.370(1))).

We recognize that other courts, in effect, have combined the two contingencies of their jurisdiction's version of Section 123(1) and concluded that a violation occurs only when there is proof that the motorist's lane excursion created some level of danger.[9] See,

---

[9] As numerous other courts have recognized, "[t]he courts of other states have not interpreted this uniform traffic provision uniformly." McBroom, 39 P.3d at 229 n.4; see also, e.g., United States v. Jones, 501 F. Supp. 2d 1284, 1296 (D. Kan. 2007) (in construing Kansas' version of Section 123(1), noting that "[a] review of other jurisdictions reveals more diversity in interpretation than one would expect for a uniform vehicle code provision"); State v. Wolfer, 780 N.W.2d 650, 652-53 (N.D. 2010) (referring to the "body of law" addressing traffic stops based on similar statutes and applying "varying standards and interpretations"); State v. Hett, 834 N.W.2d 317, 321 (S.D. 2013) (recognizing the "division of authority" on the issue of what constitutes a violation of statutes like Section 123(1)). Indeed, as demonstrated by its split decision in this case, our own Court of Criminal Appeals has wrestled with the circumstances under which a police officer might legitimately stop a motorist for either an actual or suspected violation of Section 123(1). See Smith, 2015 WL 412972, at *8 (majority holding that Trooper Achinger had both probable cause and reasonable suspicion to stop the Defendant); id. at *9-10 (Ogle, J., dissenting) (dissent opining that the trial court should have granted the motion to suppress because Trooper Achinger did not have probable cause to stop the Defendant); see also, e.g., State v. Martin, No. E1999-01361-CCA-R3-CD, 2000 WL 1273889, at *6 (Tenn. Crim. App. Sept. 8, 2000) (holding that "briefly" crossing a fog line does not violate Section 123(1) because "a momentary drift out of a lane [does not] constitute[] *driving* a vehicle outside of a single lane"); cf., e.g., State v. Gothard, No. E2005-02776-CCA-R3-CD, 2006 WL 3870957, at *4-5 (Tenn. Crim. App. Dec. 21, 2006) (upholding traffic stop where defendant crossed fog line five times, distinguishing Martin on basis that defendant's fog line crossing was "not a single isolated incident"); State v. Walker, No. E2005-02200-CCA-R3-CD, 2006 WL 2061724, at *5 (Tenn. Crim. App. July 26, 2006) (upholding traffic stop in part because defendant crossed fog line with three tires, distinguishing Martin in which motorist crossed fog line "ever so briefly" with only two tires).

11

e.g., United States v. Delgado-Hernandez, 283 Fed. Appx. 493, 499 (9th Cir. 2008) (holding that, when evaluating whether a motorist's driving violated Nevada's version of Section 123(1), courts should consider "whether, under the circumstances presented, the driver's conduct did threaten, or could be reasonably construed as potentially threatening, the safety of other motorists, pedestrians or bystanders" (citing Nev. Rev. Stat. § 484.305(1))); Crooks v. State, 710 So. 2d 1041, 1043 (Fla. Dist. Ct. App. 1998) (holding that Florida's version of Section 123(1) is not violated unless "the driver's conduct created a reasonable safety concern" (citing Fla. Stat. § 316.089(1) (1995))); Rowe v. State, 769 A.2d 879, 889 (Md. 2001) (concluding that motorist's "momentary crossing of the edge line of the roadway and later touching of that line did not amount to an unsafe lane change or unsafe entry onto the roadway, conduct prohibited by [Maryland's version of Section 123(1)], and, thus, cannot support the traffic stop" (citing Md. Code Ann., Transp. § 21-309(b))); State v. Lucero, No. 31,932, 2013 WL 4516412, at *3 (N.M. Ct. App. Feb. 26, 2013) (holding that New Mexico's version of Section 123(1) "is not intended to cover situations where the person driving a vehicle unintentionally lets the vehicle stray from its lane when there is no other traffic that it might either sideswipe or collide with" (citing N.M. Stat. Ann. § 66-7-317(A) (1978); Archibeque v. Homrick, 543 P.2d 820, 825 (N.M. 1975))); State v. Huddleston, 164 S.W.3d 711, 716 (Tex. Crim. App. 2005) (officer did not have reasonable suspicion to stop motorist for violating Texas' version of Section 123(1) because "[w]itnessing [the motorist] safely cross the fog line five times over a stretch of six miles did not give [the officer] a reason to suspect that she was unsafely failing to remain in a single lane" (citing Tex. Transp. Code Ann. § 545.060(a) (West 2004))); see also Hoay v. State, 55 S.W.3d 782, 786 (Ark. App. 2001) (holding that officer did not have probable cause to stop motorist for violating Arkansas' version of Section 123(1) because there was no evidence that the motorist did not first ascertain that his twice crossing fog line could be made safely (citing Ark. Code Ann. § 27-51-302(1) (Repl. 1994))); Tague, 676 N.W.2d at 203-04 (holding that traffic stop

---

Noting the confusion surrounding the interpretation of various states' versions of Section 123(1), one of Wyoming's Supreme Court Justices opined that

> [T]his is one bizarre statute. Apparently, it is not a crime if one violates the statute a little bit, but it is a crime if one violates the statute somewhat more than a little bit. If you stay in your lane, you have not violated the statute, but if you go out of your lane, you *may have* violated the statute. In the context of the present case, if the appellant's conduct may or may not have provided the officer with reasonable suspicion and/or probable cause to believe that the appellant violated the statute, how on earth is the appellant supposed to have notice, before the fact, that his conduct will violate the statute?

Dods v. State, 240 P.3d 1208, 1213 (Wyo. 2010) (Voigt, J., concurring). We note that there has been no constitutional challenge to Section 123(1) raised in this case.

under Iowa's version of Section 123(1) was not supported by probable cause because, although motorist briefly crossed lane edge line, the state failed to prove "any objective basis to believe [motorist's] movement was done without first ascertaining that he could make such movement with safety" (citing Iowa Code Ann. § 321.306)).

We respectfully disagree with this "combining" approach because it adds a requirement that is not reflected in, or required by, the plain text of Section 123(1). As did the Kansas Supreme Court, we view the plain language of Section 123(1) as establishing two rules of the road, see Marx, 215 P.3d at 612, and the failure to maintain either of them may result in a violation regardless of whether an actual danger is thereby created, accord id. at 611(holding that there is "no support in the statute for conditioning a violation of the single lane rule upon proof that driving outside the lane markers was unsafe"). Further, as noted by the New Jersey Supreme Court,

> If N.J.S.A. 39:4-88(b) prohibits nothing more than a lane change conducted unsafely as described in the statute's second clause, then the Legislature's language in the first clause would have no meaning. . . . The Court's construction of N.J.S.A. 39:4-88(b) gives meaning to all of the statute's language, and thereby effects the intent of the Legislature.
>
> Moreover, if N.J.S.A. 39:4-88(b) precludes only unsafe lane changes, a driver would not violate the statute even by allowing a vehicle to straddle two lanes or swerve back and forth over the lines defining traffic lanes, unless that conduct created a safety issue.

Regis, 32 A.3d at 1115.

Clearly, the primary purpose of Section 123(1) is to enhance highway safety. Just as clearly, a motorist must be allowed to leave her lane of travel in order to avoid obstructions or other dangers. Nevertheless, such excursions must be made as safely as possible, to wit, after the motorist checks the traffic conditions around her and maneuvers accordingly. However, it is not just deliberate lane excursions that may endanger other drivers or pedestrians. *Accidental* lane excursions, by definition, are made without the motorist first ascertaining their safety. Such inadvertent maneuvers may cause as much danger or damage as those made deliberately in the face of observed risks. Certainly, a motorist who is accidentally leaving her lane of travel creates a driving hazard at least to herself, if not to others.

Thus, we agree with the Ohio Court of Appeals' observations about the public policies underlying a legislature's adoption of a statute like Section 123(1):

13

The legislature did not intend for a motorist to be punished when road debris or a parked vehicle makes it necessary to travel outside the lane. Nor, we are quite certain, did the legislature intend this statute to punish motorists for traveling outside their lane to avoid striking a child or animal. We are equally certain the legislature did not intend the statute to give motorists the *option* of staying within the lane at their choosing. Common sense dictates that the statute is designed to keep travelers, both in vehicles and pedestrians, safe. The logical conclusion is that the legislature intended only special circumstances to be valid reasons to leave a lane, not mere inattentiveness or carelessness. To believe that the statute was intended to allow the motorists the option of when they will or will not abide by the lane requirement is simply not reasonable.

State v. Hodge, 771 N.E.2d 331, 338 (Ohio Ct. App. 2002) (citing Ohio Rev. Code Ann. § 4511.33); see also Tague, 676 N.W.2d at 203 (holding that the "dual purpose" of Iowa's version of Section 123(1) "is to promote the integrity of the lane markings on the highway and to ensure the safe movement of vehicles on laned roadways").

Therefore, based on the plain language of the statute, and guided by our concern for public safety, we hold that Section 123(1) is violated when a motorist strays outside of her lane of travel when *either* (1) it is practicable[10] for her to remain in her lane of travel *or* (2) she fails to first ascertain that the maneuver can be made with safety. See Tenn. Code Ann. § 55-8-123(1). Thus, even minor lane excursions may establish a violation of Section 123(1) whether or not the excursion creates a specific, observed danger.[11] Accord United States v. Bentley, 795 F.3d 630, 634 (7th Cir. 2015) (holding that proof of at least one instance of defendant's car crossing the fog line was enough to support stop under Illinois' version of Section 123(1) and noting that, "especially for probable cause determinations, there is no rule excusing momentary slips"), pet'n for cert. docketed (Jan. 21, 2016); United States v. Salas, 756 F.3d 1196, 1202 (10th Cir. 2014) (holding that even a single crossing of the fog line created reasonable suspicion to stop a motorist for violating Oklahoma's version of Section 123(1)); United States v. Alvarado, 430 F.3d 1305, 1309 (10th Cir. 2005) (holding that reasonable suspicion supported traffic stop under Utah's version of Section 123(1) after officer observed vehicle drift one foot over fog line where "the driver could reasonably be expected to maintain a straight course at that time in that vehicle on that roadway"); State v. Johnson,

---

[10]     With regard to practicability, we recognize specifically that a motorist legitimately may leave her lane of travel in order to pass another motorist so long as the passing maneuver is made in accordance with the applicable statutes.

[11]     We emphasize that an officer has discretion as to when to stop drivers for such possible violations. We do not mean to require or imply that a stop should be made in all such instances.

No. A07-1566, 2008 WL 5214469, at *3 (Minn. Ct. App. Dec. 16, 2008) (holding that officer's observation of defendant's car crossing the fog line a single time, "although it may be an insignificant infraction [of Minnesota's version of Section 123(1),] provided the officer a specific reason to believe that the traffic code had been violated and to stop the car . . . for a limited investigatory stop"); State v. Wolfer, 780 N.W.2d 650, 652 (N.D. 2010) (holding that defendant's single crossing of fog line gave officer reasonable suspicion that motorist violated North Dakota's version of Section 123(1) because "the record contains evidence demonstrating the practicability of [defendant] remaining entirely within his lane"); State v. Mays, 894 N.E.2d 1204, 1210 (Ohio 2008) (holding that "a traffic stop is constitutionally valid when a law-enforcement officer witnesses a motorist drift over the lane markings in violation of [Ohio's version of Section 123(1)], even without further evidence of erratic or unsafe driving"); Hodge, 771 N.E.2d at 339 (holding that motorist's partial drifting from one lane into adjacent lane "when it was practicable to stay within his own lane" supported traffic stop for violation of Ohio's version of Section 123(1)); State v. Hett, 834 N.W.2d 317, 323 (S.D. 2013) (holding that motorist's single crossing of fog line created a reasonable suspicion that motorist had violated South Dakota's version of Section 123(1) when the facts demonstrated the practicability of the motorist remaining entirely within his lane); Dods v. State, 240 P.3d 1208, 1211-12 (Wyo. 2010) (holding that "a single instance of crossing the fog line can indeed be a violation of [Wyoming's version of Section 123(1)]" but cautioning that "a court must examine all of the surrounding circumstances to determine whether there is a justification for the stop"); see also Mitchell, 347 P.3d at 1280 (holding that motorist violated Montana's version of Section 123(1) by crossing the center yellow line and officer therefore had reasonable suspicion to stop motorist); State v. Bedell, No. 2011-069, 2011 WL 6003859, at *2 (Vt. Nov. 9, 2011) (entry order) (holding that motorist's crossing of center lane line provided officer with reasonable suspicion to stop motorist for violating Vermont's version of Section 123(1)); but see, e.g., State v. Au, 829 N.W.2d 695, 700 (Neb. 2013) (officer did not have probable cause to stop motorist for violating Nebraska's version of Section 123(1) because officer's testimony "failed to establish that vehicle was not driven 'as nearly as practicable' in the right-hand lane" but "showed that touching or crossing lane divider lines was a common occurrence").

In this regard, we respectfully disagree with the Kansas Supreme Court which, in spite of its analysis quoted *supra*, went on to construe Kansas' version of Section 123(1) as "requir[ing] more than an incidental and minimal lane breach" because the text of the statute "only requires compliance with the single lane rule as *nearly* as practicable, *i.e.*, compliance that is *close* to that which is feasible." Marx, 215 P.3d at 612; see also, e.g., State v. Livingston, 75 P.3d 1103, 1106 (Ariz. Ct. App. 2003) (holding that "as nearly as practicable" language contained in Arizona's version of Section 123(1) "demonstrates an express legislative intent to avoid penalizing brief, momentary, and minor deviations outside the marked lines"). We reject this muddying of the waters. The words

15

"incidental," "minimal," "brief," "momentary," and "minor" present significant definitional challenges in the context of assessing the constitutionality of a traffic stop.[12] Accordingly, we hold that "as nearly as practicable" means that a motorist must not leave her lane of travel any more than is made necessary by the circumstance requiring the lane excursion. For instance, if the motorist is driving a large vehicle with a high profile, such as an RV, and the weather includes high velocity wind gusts, minor crossings of lane lines occurring in conjunction with the wind gusts may satisfy the "as nearly as practicable" language of the statute and may not constitute a violation of Section 123(1). See, e.g., United States v. Freeman, 209 F.3d 464, 467-68 (6th Cir. 2000) (holding that officer did not have probable cause to stop top-heavy motor home for violating Section 123(1) where motor home crossed fog line for one-third of a second during high winds); United States v. Gregory, 79 F.3d 973, 978 (10th Cir. 1996) (holding that officer did not have grounds to stop U-Haul rental truck under Utah's version of Section 123(1) because "[t]he road was winding, the terrain mountainous and the weather condition was windy. Under these conditions any vehicle could be subject to an isolated incident of moving into the right shoulder of the roadway, without giving rise to a suspicion of criminal activity."); cf. United States v. Ozbirn, 189 F.3d 1194, 1198 (10th Cir. 1999) (construing Kansas' version of Section 123(1) and holding that "[officer] had probable cause to stop [defendant] after he saw the motor home drift onto the shoulder twice within a quarter mile under optimal road, weather and traffic conditions"). Such lane excursions are not caused by the danger of driver inattention and are not within the scope of the driving conduct prohibited by Section 123(1).

We caution that in many cases it will not be possible for an observing officer to discern either the reason for a driver's leaving her lane of travel or whether she first ascertained the safety of the maneuver. In those cases, the officer would have to investigate further in order to determine whether the driving maneuver violated Section 123(1). See Hackett, 971 N.E.2d at 1066 (holding that an investigatory stop made after officer observed motorist deviating from lane for no apparent reason "allows the officer to inquire further into the reason for the lane deviation, either by inquiry of the driver or verification of the condition of the roadway where the deviation occurred"). In such cases, the officer would not have probable cause to stop the motorist but might have sufficient reasonable suspicion to do so. See id. (holding that officer was justified in making an investigatory traffic stop after observing motorist twice deviate from his own lane of travel to an adjacent lane of travel for no obvious reason).

Our review of the pertinent cases indicates that some courts have concluded that a police officer has *probable cause* to stop a motorist simply upon observing the motorist

---

[12]     Again, we emphasize that our holding today only relates to the constitutionally permissible parameters of traffic stops made pursuant to the statute. We do not address or intend to alter an officer's discretion in determining whether to make such a stop.

cross over a fog line.  See, e.g., United States v. Sessoms, No. 2:14-CR-1-FL-1, 2014 WL 5822865, at *7-8 (E.D.N.C. Nov. 10, 2014) (holding that officer had probable cause to stop motorist for violating North Carolina's version of Section 123(1) upon witnessing a single fog line crossing); State v. Malone, 56 So. 3d 336, 343-44 (La. Ct. App. 2010) (stating that a car crossing a fog line violates Louisiana's version of Section 123(1), thereby providing "probable cause to believe that a traffic violation for improper lane usage has occurred").  We respectfully reject this approach because it would be tantamount to construing Section 123(1) as creating an offense that is *always* committed upon a fog line crossing.  Such a construction is contrary to the plain text of the statute.

Moreover, the distinction between a stop based on probable cause and a stop based on reasonable suspicion is not simply academic.  As set forth above, reasonable suspicion will support only a brief, investigatory stop.  See Terry, 392 U.S. at 27-29; see also Bentley, 795 F.3d at 633 (noting the necessity to "distinguish between stops based on reasonable suspicion and those based on probable cause [because] [t]he latter are not subject to the scope and duration restrictions of Terry"); State v. Troxell, 78 S.W.3d 866, 871 (Tenn. 2002) (recognizing that investigative stops must be "reasonably related in scope to the circumstances which justified the interference in the first place" and that the stop "must be temporary and last no longer than necessary to effectuate the purpose of the stop" (quoting Terry, 392 U.S. at 20, and Florida v. Royer, 460 U.S. 491, 500 (1983)) (internal quotation marks omitted)).

Upon our review of the cases cited above and other cases, and taking into account the plain text of Section 123(1) and the overriding purpose of enhancing highway safety, we conclude that, when an officer observes a motorist crossing a clearly marked fog line, the totality of the circumstances *may* provide a reasonable suspicion sufficient to initiate a traffic stop to investigate the possible violation of Section 123(1).[13]  If the officer observes circumstances rendering it practicable for the motorist to remain in her lane of travel, that observation will weigh in favor of reasonable suspicion.  Similarly, if the officer observes that the motorist's crossing of the fog line in some specific regard was unsafe, indicating that the driver failed to first ascertain the safety of the lane excursion, that observation will weigh in favor of reasonable suspicion.  In all events, however, a trial court considering the legality of a stop made pursuant to Section 123(1) must consider *all* of the relevant circumstances in deciding whether the motorist's lane excursion gave the officer a constitutionally sufficient basis to at least suspect that the motorist was violating Section 123(1).  See Alvarado, 430 F.3d at 1309 (opining that determining the constitutionality of a traffic stop made pursuant to Utah's version of Section 123(1) "require[s] a fact-specific inquiry into the particular circumstances present

---

[13]     We recognize that some lane excursions may be so egregious that they will support probable cause to stop the motorist.

during the incident in question in order to determine whether the driver could reasonably be expected to maintain a straight course at that time in that vehicle on that roadway"); see also Day, 263 S.W.3d at 903 ("Determining whether reasonable suspicion exists in a particular traffic stop is a fact-intensive and objective analysis.").

We reiterate that an individual does not lose her constitutional rights against unreasonable seizures by driving a car. Nevertheless, an individual's constitutional rights against unreasonable seizures must be balanced against the public interest of police officers enforcing traffic statutes designed to ensure the safety of the motoring public, pedestrians, and property. While minor traffic infractions may lead to the commendable discovery of an intoxicated motorist, we are cognizant that there are many distractions in today's driving environment that may divert a sober motorist's attention and cause her to momentarily and inadvertently leave her lane of travel. See Marx, 215 P.3d at 607 (recognizing that "automobiles, unlike railway locomotives, do not run on fixed rails"). Commentators have cautioned that allowing police officers to stop motorists for de minimus driving anomalies creates a "stop at will" environment at complete odds with the Fourth Amendment. See, e.g., Lewis R. Katz, "Lonesome Road": Driving Without the Fourth Amendment, 36 Seattle U. L. Rev. 1413, 1413 (Spring, 2013) (asserting that "[o]ur streets and highways have become a police state where officers have virtually unchecked discretion about which cars to stop for the myriad of traffic offenses contained in state statutes and municipal ordinances"); David A. Moran, The New Fourth Amendment Vehicle Doctrine: Stop and Search Any Car at Any Time, 47 Vill. L. Rev. 815, 816 (2002) (referring to a series of United States Supreme Court opinions as establishing a "new, and greatly simplified, Fourth Amendment vehicle doctrine: the police may, in their discretion, stop and search any vehicle at any time"); Elizabeth Ahern Wells, Note, Warrantless Traffic Stops: A Suspension of Constitutional Guarantees in Post September 11th America, 34 U. Tol. L. Rev. 899, 899 (Summer, 2003) (describing the United States Supreme Court's interpretation of the reasonable suspicion standard as having "evolved into a veritable green light for police officers, resulting in a complete disregard for personal security"). We emphasize that our decision in this case is not intended to provide law enforcement officers with "carte blanche" to seize motorists every time they see a vehicle cross a fog line. Rather, an officer's seizure of a motorist for a suspected violation of Section 123(1) must be supported, at a minimum, by a reasonable suspicion, based on all of the relevant circumstances, that the driver left her lane of travel when it was practicable to remain there and/or left her lane of travel without first ascertaining that it was safe to do so.[14]

_____

[14] We recognize our Court of Criminal Appeals' concern that our holding in this case "will likely mean that all drivers (including law enforcement officers, prosecutors, and judges) who briefly cross a fog line on the highways in Tennessee can be pulled over on the basis that the otherwise 'innocent' driver has established [reasonable suspicion] that she or he has committed a Class C misdemeanor criminal offense." Smith, 2015 WL 412972, at *8. Nonetheless, we are tasked with construing Tennessee's legislation as it

*The Defendant's Stop*

Based upon the contingencies contained within Section 123(1), under the particular facts and circumstances of this case, Trooper Achinger could not know whether the Defendant actually had violated Section 123(1) except upon further investigation. The record contains no proof about the Defendant's reasons for leaving her lane of travel. The record also contains no proof about whether the Defendant first ascertained that she could leave her lane of travel with safety. All Trooper Achinger observed was the Defendant crossing over the fog line with the two right wheels of her car and then twice touching it with the right wheels of her car.

As we indicated above, crossing over a lane line with two of a car's four wheels is an instance of leaving one's lane of travel. However, only by questioning the Defendant would Trooper Achinger have been able to ascertain whether the Defendant had determined that remaining within her lane of travel had become impracticable for some legitimate reason unknown to him and whether she had first ascertained the safety of her maneuver. Accordingly, we hold that the proper basis for analyzing the constitutionality of Trooper Achinger's stop of the Defendant is whether he had a reasonable suspicion, supported by specific and articulable facts, that the Defendant had violated Section 123(1) by crossing over the clearly marked fog line with the two right wheels of her car.

Our conclusion is consistent with our analysis in State v. Brotherton, 323 S.W.3d 866 (Tenn. 2010). In that case, a state trooper saw a "bright light" shining from the defendant's car's taillight area. Id. at 868. The trooper began following the defendant and eventually stopped him "to investigate the broken taillight." Id. During the stop, the trooper deduced that the defendant was driving under the influence and arrested him. Id. After the trial court denied the defendant's motion to suppress, the defendant pled guilty to DUI but reserved a certified question of law regarding the legality of his traffic stop. Id. at 869.

This Court was careful to analyze the defendant's traffic stop in terms of whether the officer had reasonable suspicion, not probable cause, to believe that the defendant was in violation of Tennessee Code Annotated section 55-9-402(b), which contains multiple requirements for vehicular "tail lamps" and "stoplights." In Brotherton, the defendant had used red tape in an attempt to repair a broken taillight, but the efficacy of the repair was questionable. Because the repair permitted a "bright white light to shine

is written. If our legislators are concerned that too many innocent drivers are being pulled over for minor lane infractions, they may amend Section 123(1) or pass other corrective legislation. See Thomas M. Lockney & Mark A. Friese, Constitutional Roadkill in the Courts:  Looking to the Legislature to Protect North Dakota Motorists Against Almost Unlimited Police Power to Stop and Investigate Crime, 86 N.D. L. Rev. 1 (2010) (proposing legislation to require probable cause for traffic stops).

through," Brotherton, 323 S.W.3d at 871, contrary to the function of a taillight in good repair, the officer had a specific and articulable reason to suspect that the defendant's car was not in compliance with the statute's requirements, id. at 872. Accordingly, we held that the officer was justified in conducting *an investigatory stop* of the defendant. Id.

We turn, then, to whether Trooper Achinger's seizure of the Defendant was supported by reasonable suspicion. This analysis requires us to consider, from the position of a reasonable officer, the circumstances indicative of whether the driving conditions facing the Defendant allowed her to remain entirely in her lane "as nearly as practicable." If there were no apparent driving conditions present that rendered it impracticable for the Defendant to stay in her lane, then that fact supports a finding of reasonable suspicion that the Defendant may have violated Section 123(1) by crossing the fog line. For instance, had Trooper Achinger observed nothing more than the Defendant crossing the fog line in order to avoid the body of a deer laying in her lane of travel, and that she caused no safety hazard in doing so (thereby indicating that she had first ascertained the safety of her maneuver), Trooper Achinger would have had no constitutionally defensible reason to suspect that the Defendant had violated Section 123(1).

Even if there was a circumstance that rendered it impracticable for the Defendant to remain in her lane of travel, Trooper Achinger still might have had a constitutional basis for initiating a traffic stop if he observed the Defendant leaving her lane of travel in a manner that was unsafe. For instance, if the Defendant swerved to the left of the body of a deer instead of to the right and thereby caused another vehicle to swerve to avoid a collision, Trooper Achinger would have had at least a reasonable suspicion, if not probable cause, to believe that the Defendant had violated Section 123(1) by failing to ascertain that she could leave her lane of travel safely.

Turning to the proof adduced at the hearing on the Defendant's motion to suppress, we note first that Trooper Achinger observed the Defendant driving at approximately 3:00 in the morning, a time at which a driver may be more likely to be fatigued or impaired. Such circumstances increase the likelihood of accidental lane excursions. Second, the Defendant was driving on an interstate highway, a roadway with clearly marked lane lines, designed to be driven at high speeds, and with lanes wide enough to accommodate tractor-trailers traveling side by side, even through the curves. See United States v. Tang, 332 Fed. Appx. 446, 452 (10th Cir. 2009) (finding reasonable suspicion to stop motorist for violating Utah's version of Section 123(1) where U-Haul crossed fog line with both back right tires where, "[a]lthough it was dark and there was a mild to moderate wind, the interstate was not winding or narrow and only curved gradually to the left"); cf. Gregory, 79 F.3d at 978 (no reasonable suspicion to stop U-Haul truck for a single fog line crossing where "[t]he road was winding, the terrain

20

mountainous and the weather condition was windy"). Third, the video recording reveals that the weather and the roadway were dry. Fourth, although the video camera did not capture the Defendant actually crossing the fog line, it is clear from the recording that Trooper Achinger did not need to swerve from the same lane of travel in order to avoid some obstruction or pothole in the roadway while he was following the Defendant. See Bentley, 795 F.3d at 634 (in upholding traffic stop for a suspected violation of Illinois' version of Section 123(1), noting that the proof demonstrated "no extenuating circumstances that made it difficult for [the defendant] to stay in his lane"). Fifth, there is no proof in the record indicating that the Defendant's lane excursion was preceded by a signal indicating her intention to leave her lane or that it was followed by a lessening in speed indicating her intention to pull onto the shoulder and stop. Again, these circumstances are indicative of an inadvertent lane excursion.

The totality of these circumstances established reasonable grounds to suspect that the Defendant left her lane of travel *accidentally*, not because it was impracticable for her to remain in her lane. As indicated above, if a motorist is engaging in a driving maneuver by accident rather than deliberately, the motorist is not first ascertaining whether the maneuver can be made with safety. In light of very similar circumstances, the United States District Court for Kansas upheld a stop for a suspected violation of Kansas' version of Section 123(1):

> The court finds that Trooper Nicholas possessed reasonable suspicion the defendant Blanchard did not purposely move from her lane of travel onto the shoulder and, thereby, failed to first ascertain that her lane movement could be made safely. There is no evidence that the defendant Blanchard used her turn signal before crossing over the fog line and driving onto the shoulder by a tire's width. Instead of slowing down and stopping on the shoulder, the defendant's vehicle maintained its speed and returned to a proper lane of the roadway after a matter of seconds. There is no evidence that the defendant Blanchard departed from her lane onto the shoulder in response to an apparent hazard or adverse physical conditions or for some other equally valid or lawful reason. One can reasonably infer from these circumstances that the defendant Blanchard never actually intended to move from her lane of traffic. Thus, Trooper Nicholas had reasonable suspicion to believe that Blanchard moved out of her lane of travel without first ascertaining whether she could do so safely, all in violation of K.S.A. § 8-1522(a).

United States v. Jones, 501 F. Supp. 2d 1284, 1298-99 (D. Kan. 2007) (footnotes omitted).

21

Accordingly, we hold that the totality of the circumstances surrounding the Defendant's traffic stop established a reasonable suspicion, supported by specific and articulable facts, that the Defendant violated Section 123(1) when she crossed the fog line and failed to remain entirely within her lane of travel. Therefore, Trooper Achinger was justified in stopping the Defendant to investigate further the reasons for her leaving her lane of travel. Cf. Marx, 215 P.3d at 612-13, 615 (holding that stop was not supported by reasonable suspicion where officer testified only to seeing motor home cross fog line once, overcorrect, and cross lane dividing two northbound lanes of interstate because state produced no proof from which to infer that "it was practicable to maintain a single lane" or of "traffic or weather conditions, time of day, or any other observation relating to the practicability of the momentary deviation") (latter quote from Davis, J., concurring).

In sum, although we disagree with the trial court that probable cause supported the Defendant's traffic stop, we hold that the trial court properly denied the Defendant's motion to suppress. Accordingly, the Defendant is not entitled to relief on the basis of her certified question of law, and we affirm the Defendant's judgment of conviction.

## Conclusion

Trooper Achinger's stop of the Defendant did not violate the constitutional rights of the Defendant because it was supported by reasonable suspicion. Therefore, we affirm the judgment of the Court of Criminal Appeals.

_____
JEFFREY S. BIVINS, JUSTICE

22