IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 16, 2019 Session

## STATE OF TENNESSEE v. WHELCHER[1] RANDALL HOGAN

**Appeal from the Circuit Court for Dickson County**
**No. 22CC-2011-CR-759   Larry J. Wallace, Judge**

_____

## No. M2017-02256-CCA-R3-CD

_____

Defendant, Whelchel Randall Hogan, pled guilty to possession of less than .5 grams of cocaine with the intent to sell or deliver after the denial of a motion to suppress. As part of the guilty plea, Defendant reserved a certified question of law regarding the legality of his traffic stop. After a review of the record, we reverse the judgment of the trial court and dismiss Defendant's conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Dismissed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

David D. Wolfe (at hearing), and Andrew Mills (on appeal), Dickson, Tennessee, for the appellant, Whelchel Randall Hogan.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Ray Crouch, District Attorney General; and Kelly Jackson Smith, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

Defendant was arrested on October 26, 2011, by Agent Michael Pate of the Twenty-Third Judicial District Drug Task Force in conjunction with a traffic stop. In

---

[1] Defendant's name is spelled "Whelcher" in the technical record, including on the indictment and the motion to suppress. At the hearing on the motion to suppress, Defendant spelled his name "Whelchel" for the court reporter. We will utilize the spelling of the name as indicated by Defendant at the hearing on the motion to suppress in our written opinion.

March of 2012, Defendant was indicted by the Dickson County Grand Jury for possession of synthetic marijuana in Count One; simple possession of marijuana in Count Two; possession of more than .5 grams of cocaine with the intent to sell or deliver in Count Three; possession of a Schedule IV drug, Xanax, in Count Four; and unlawful drug paraphernalia uses and activities in Count Five.

Prior to trial, Defendant filed a motion to suppress the evidence, arguing that the evidence was obtained as a result of an illegal warrantless search performed without probable cause. The trial court held a hearing on the motion to suppress.

At the hearing, Agent Pate explained that he had been assigned to the Task Force for approximately "a year and a half" at the time of Defendant's arrest. Prior to that particular day, agents from the task force had been running surveillance and controlled-buy operations at one side of a duplex on East Rickert Street, using criminal informants to purchase crack cocaine at what he described as a "crack house" for six to eight weeks. Agent Pate agreed that the residence on one side of the duplex was associated with criminal activity while the residence on the other side was not.

Agent Pate explained that officers discovered the house was a "crack house" after several informants purchased crack at the house. Eventually, about six days prior to Defendant's arrest, the agents "got consent from [Misty Hill,] one of the people that lived in the house[,] to search it." They found crack pipes, crack, and copper mesh used for smoking cocaine. Ms. Hill informed agents that she was a crack dealer and often cheated her clients so that she could get crack.

Agent Pate elaborated that approximately five or six days prior to Defendant's arrest, officers observed "an informant in the front yard of the [same] house" where a man named Antwone Hall, or "Playground," lived. The informant was wearing both a recording and listening device. Officers observed a white Jeep in the driveway and heard the informant request crack cocaine from the person in the passenger seat of the Jeep. The informant was instructed to wait for about twenty to thirty minutes for the drugs. The Jeep left and returned about twenty to twenty-five minutes later. At that time, officers turned on blue lights and initiated a traffic stop. "Playground" was in the passenger seat and had "a crack rock in one hand and a bag in the other" as officers approached. The Jeep "sped away," nearly running over two agents. After a short pursuit, the occupants of the Jeep "ditched the vehicle and everybody ran." Eventually, crack was recovered from the floorboard of the Jeep.

On the day of Defendant's arrest, Agent Pate was parked about 150 yards from the duplex, "watching people come and go." He was using a new surveillance vehicle that he described as "an unmarked car." He explained that the task force "had been there so

much and had been paying so much attention to that house, [the people at the house] were getting pretty smart at picking out pretty quick what vehicle we were in."

Agent Pate saw an SUV pull up to the house around 9:30 p.m. The vehicle appeared to stay running while sitting "there for a minute, minute and a half tops." Agent Pate "couldn't see the front area of the car" and "did not see anybody come to the driver's side or get out of the car." Then, "the vehicle backed out [away from the house] and came" down the road in the direction of the surveillance vehicle. The SUV drove "directly" past Agent Pate.

At that time, Agent Pate started his vehicle, "spun around and got behind" the SUV, following it down the road. Agent Pate described the speed the vehicle was moving as "pretty good." Agent Pate followed the vehicle to a red light, where the vehicle made a turn. Agent Pate continued to follow the vehicle until it "just stopped in the middle of the road" on Cedar Street. Before the vehicle stopped, Agent Pate did not have his blue lights on, but "was going to make a traffic stop on him . . . [b]ecause he pulled consistent to the way every person that we've arrested with crack leaving there, every time we bought crack from that house." When the vehicle stopped on the road, Agent Pate "turned on [his] blue lights as [he] was exiting the vehicle." At 9:26:54 p.m., Agent Pate called dispatch to notify them of the situation.[2] Agent Pate also called for Agent Chris Lewis to bring his police dog to the scene.

Agent Pate "walked up to the car" and identified himself. At that point, he recognized Defendant because he was "a known drug dealer." Agent Pate "felt like [Defendant] recognized [him] because he stopped" his vehicle before the blue lights were activated. Agent Pate "told him that the reason why [he] stopped him was because he left a known crack house." Agent Pate did not initially smell anything or see any evidence of criminal activity inside Defendant's vehicle. In fact, Agent Pate admitted that Defendant had not violated any traffic laws at that point in time and he had seen no evidence of a crime being committed. Defendant informed Agent Pate that he was there for his cousin. Agent Pate told Defendant he thought Defendant had "either just dropped off crack or picked up crack" and asked to search the car. Defendant told Agent Pate there was no reason to search the car because the only thing he had was a marijuana "blunt" that he handed Agent Pate from the center console of the vehicle. Agent Pate claimed that he could smell the burnt marijuana. The blunt was half-smoked when Agent Pate received it from Defendant.

Agent Pate thought Defendant had more drugs in the vehicle because "he'd just left a crack house." He asked Defendant to step out of the vehicle. One of the task force

---

[2] Agent Pate explained that he "Actually had him stopped earlier than what this is going to generate" because the call could not be made simultaneously with the stop.

agents who had arrived on the scene started "patting" Defendant down by grabbing "the waistband of his pants" and "shaking it pretty good" when a "roll of plastic came rolling out of his pants leg and hit the road." Agent Pate grabbed it and observed that it "looked like crack rocks inside of it."

Admittedly, Agent Pate was unable to see Defendant at the duplex during the surveillance period from his vantage point. Agent Pate had "logged [Defendant's] vehicle there several times." He also discovered that Defendant's "girlfriend had the electric bill in her name" at that address but was not certain if the electric bill corresponded to the "crack house" portion of the duplex or the other side. Regardless, Defendant's girlfriend was "not living there" at the time of the surveillance that led to the arrest.

Defendant testified briefly at the hearing. He explained that he was heading to his cousin's house on Highway 70 and was on his way to "meet [his] girlfriend" Vanessa that night. Defendant "was coming around like past the junior high" when "Nessa" sent him a text at 9:28 p.m. to let him know that she was there. Defendant "pulled over in front of Gilbert Hodges' house, 406." Defendant "used to live right there." He "stayed there for a minute, and [he] texted her back 'K,' and [he] pulled off." Defendant sent the return text message at 9:28 p.m. When Defendant started driving again, he saw a vehicle in his "rearview mirror flying." Defendant turned down Main Street where he saw the pursuing vehicle run a stop sign. Defendant pulled over to the side and the car turned on its blue lights. Defendant denied violating any traffic offenses and/or blocking the roadway. Defendant also denied having any contact with anyone at either side of the duplex on Rickert Street.

According to Defendant, after Agent Pate turned on the blue lights and approached the vehicle, he asked Defendant for his license and insurance card. Defendant complied. Agent Pate returned to his vehicle. Defendant waited with his hands on the wheel while another officer was watching him. The "23rd District truck pull[ed] up," and the next thing Defendant knew, law enforcement officers "piled up at [his] door" asking to search the car. Agent Pate "popped the door [of Defendant's vehicle] open," and Defendant got out. One of the officers patted him down. Defendant claimed that he did not give anyone a marijuana cigar and did not consent to the search of his vehicle.

At the conclusion of the hearing, counsel for Defendant directed the trial court to this Court's opinion in *State v. James B. Hunter*, No. 2006-01173-CCA-MR3-CD, 2007 WL 2088943 (Tenn. Crim. App. July 23, 2007), *no perm. app. filed*.[3] The trial court took

---

[3] In *James B. Hunter*, this Court determined that there was reasonable suspicion for the initial stop of the defendant because the officers had observed the defendant engaging in "suspicious activity over the course of an hour" in an area where there was drug activity. 2007 WL 2088943, at *5.

- 4 -

the matter under advisement, partially in order to review *James B. Hunter* in addition to the testimony at the hearing.

The following week, the trial court made the following findings of fact and conclusions of law from the bench:

> [T]he basic facts are there's a house located in Dickson, Tennessee. It's a two-part house. At least one portion of the house is a crack house.
>
> The officers had actually searched the house on a previous occasion for crack cocaine and/or drug paraphernalia or evidence of drug activity. They had made controlled buys from the residence, and they had seen numerous vehicles pull up to the residence, stay a very short period of time and leave.
>
> . . . . The officers observed [Defendant] pull up to the residence, stay a short period of time and leave as many other vehicles had done, including the controlled buys that the officers had conducted at the residence, which gave the officers a specific and articulable fact that a possible drug deal had gone down. And supported the basis of stopping [Defendant] the night he was stopped.
>
> I know [Defendant] testified at the suppression hearing that he pulled in to communicate and text with his girlfriend. Of course, you have to look at the credibility of the witnesses, and one thing we tell juries to look at in judging the credibility is if the person has an interest in the outcome.
>
> Well, obviously, nobody's got more interest in the outcome of this case than [Defendant]. So the Court doesn't give a lot of credence to [Defendant's] credibility on this issue.
>
> But even if I believed everything [Defendant] said, it's really irrelevant. The officers had no way of knowing that, in fact, he was sending a text. It's what's in the officers' mind objectively and/or subjectively, I guess, at the time of making the stop. . . .
>
> They didn't at the time know who [Defendant] was. Officer Pate testified very honestly, he pursued [Defendant] and had the intention of

---

However, we reversed the trial court's ruling because the officers "learned of [no] new information during the stop of the defendant that gave probable cause to search the defendant and his vehicle." *Id.*

stopping [Defendant] even though his testimony was [Defendant] stopped before he turned on his blue lights.

After Officer Pate turned on his blue lights behind [Defendant], he approached the vehicle [and recognized him as a known drug dealer]. . . .

So we've got this, what I've already said was a reasonable suspicion based on specific and articulable facts that he had stopped for a short period of time at a known crack house. He left. The officers pursued him, and justifiably stopped him.

Now, did they have probable cause to search the vehicle? What do they know at this point in time? Well, they know they've got a previously convicted drug dealer pulled over after leaving a crack house.

During the interactions with [Defendant], [Defendant] hands the officers what was testified to as a marijuana blunt, . . . . Obviously, at that point in time if the officers didn't have probable cause to search the vehicle, they never will.

The trial court both orally denied the motion to suppress and later prepared a written order. In the written order, the trial court commented that "the reasonable suspicion in [Defendant's] case was much stronger than in [*James B.*] *Hunter* and that once stopped, the fact that the Defendant is a known drug dealer, that he was leaving a known crack house and the fact that the Defendant handed law enforcement a marijuana cigar was enough to constitute probable cause for the search."

After the denial of the motion to suppress, Defendant initially sought an interlocutory appeal pursuant to Tennessee Rule of Appellate Procedure 9. This Court denied the application based on several reasons, including Defendant's failure to include a copy of the order denying the motion to suppress.

In October of 2017, Defendant entered a guilty plea to one count of possession of less than .5 grams of cocaine with the intent to sell or deliver.[4] As part of the guilty plea,

---

[4] As part of this plea agreement, Defendant also settled other cases, one of which also involved the resolution of a certified question and was pending on appeal at the time of oral argument in this case. Since that time, this Court has issued its opinion in that case, affirming the trial court's denial of a motion to suppress with regard to an initial seizure of Defendant and the subsequent search of a motel room, which led to a conviction for possession of .5 grams or more of cocaine with the intent to sell or deliver. *See State v. Whelchel Randall Hogan*, No. M2017-02254-CCA-R3-CD, 2019 WL 413740, at *5 (Tenn. Crim. App. Feb. 1, 2019).

Defendant reserved the following certified question of law pursuant to Tennessee Rule of Criminal Procedure 37(b):

> Whether the trial court correctly ruled following a suppression hearing that the State had reasonable suspicion to effectuate a stop of the Defendant and Defendant's vehicle?

It is under this framework that this case is presented to this Court on appeal.

## I. Certified Question

A certified question must be dispositive of the case. Tenn. R. Crim. P. 37(b)(2)(iv). A question is dispositive when this Court must either affirm the judgment of conviction or reverse and dismiss the charges. *State v. Dailey*, 235 S.W.3d 131, 134 (Tenn. 2007). This Court is not bound by the determination of the trial court or the parties that the certified question of law is dispositive of the case, and we must make an independent determination of whether the certified question is dispositive. *Dailey*, 235 S.W.3d at 134-35.

Here, the Defendant's certified question is limited to whether there existed reasonable suspicion for the initial traffic stop. In *State v. Freddie Ali Bell*, we found a very similar certified question to be dispositive. No. M2015-01999-CCA-R3-CD, 2016 WL 4036392, at *2-3 (Tenn. Crim. App. July 25, 2016), *no perm. app. filed* (finding certified question "[w]hether the record support[s] the finding of probable cause or reasonable suspicion to legally permit a seizure of the defendant and his vehicle" to be dispositive). We again stress that a more precisely worded and factually specific certified question would have been beneficial, but conclude that the certified question herein is dispositive because without reasonable suspicion for the traffic stop, the cocaine discovered in the subsequent search would have to be suppressed and there would be no evidence to support Defendant's conviction. Consequently, we see no reason to depart from our reasoning in *Freddie Ali Bell* and conclude that the certified question is properly before this Court. *Id.*

## II. Motion to Suppress

Defendant argues that his presence in "an alleged area of criminal activity," without more, does not constitute reasonable suspicion for a traffic stop. The State disagrees, pointing to other facts in the record that supported a finding of reasonable suspicion for Agent Pate's decision to conduct the traffic stop, including the long-term observation of the crack house, a search of the crack house, information obtained from undercover drug buys at the crack house, and the pattern of the operation of buying and selling crack at the house.

Generally, we will uphold a trial court's findings of fact at a suppression hearing unless the evidence preponderates to the contrary. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Id.* "We afford to the party prevailing in the trial court the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998). As to the trial court's application of the law to the facts, however, we apply a de novo standard of review. *Id.*

Both the Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution guarantee the right to be free from unreasonable searches and seizures. *See State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000). Tennessee's constitutional protections regarding searches and seizures are identical in intent and purpose to those in the federal constitution. *State v. Turner*, 297 S.W.3d 155, 165 (Tenn. 2009).

In evaluating the constitutionality of warrantless searches, this Court must "evaluate the search or seizure under traditional standards of reasonableness" by balancing an individual's privacy interests against legitimate governmental interests. *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999). "[A] warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 626, 630 (Tenn. 1997). The State has the burden to demonstrate, by a preponderance of the evidence, that a warrantless search passes constitutional muster. *State v. Harris*, 280 S.W.3d 832, 839 (Tenn. Crim. App. 2008).

Before we analyze the warrantless search in this case, we must closely look at the seizure (stop) of Defendant and his vehicle that came before the search. That, in our view, is the point at which the State and Agent Pate fell short and the factual path departs from *State v. James B. Hunter*.

"One exception to the warrant requirement exists when a police officer makes an investigatory stop based upon reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 20-21 (1968); *State v. Bridges*, 963 S.W.2d 487, 492 (Tenn. 1997)). The moment that a police officer turns on the blue lights of his patrol vehicle, the "police officer has clearly initiated a stop and has seized the subject of the stop." *Binette*, 33 S.W.3d at 218. In cases involving a seizure when a police officer pulls over a vehicle, the police officer must have reasonable suspicion of criminal activity, supported by

specific and articulable facts, *at the time that the police officer turns on the blue lights*. *Id.*. "Reasonable suspicion is a particularized and objective basis for suspecting the subject of a stop of criminal activity . . . , and it is determined by considering the totality of the circumstances surrounding the stop . . . ." *Id.* (internal citations omitted).

In the present case, there is no question that Defendant was clearly "seized" within the meaning of the state and federal constitutions the moment Agent Pate activated his car's blue lights. However, in order for that seizure to be constitutionally valid, Agent Pate must have possessed at least reasonable suspicion, supported by specific and articulable facts, that Defendant had committed or was about to commit an offense at the time the blue lights were turned on. Of course, we review the validity of a stop from a "purely objective perspective," and this Court may consider "relevant circumstances demonstrated by the proof even if not articulated by the testifying officer as the reasons for the stop." *State v. Smith*, 484 S.W.3d 393, 402 (Tenn. 2016). Thus, we must determine whether, from our objective perspective, the circumstances surrounding the stop supported a finding of reasonable suspicion for the stop.

Defendant argues on appeal that Agent Pate testified at the hearing on the motion to suppress that he had not seen any evidence of any criminal activity before stopping Defendant, so there could be no reasonable suspicion for the stop. The State insists that Defendant's actions, in addition to the information obtained from the ongoing surveillance at the duplex were enough to provide reasonable suspicion for the stop. While a defendant's presence in an area associated with criminal activity is certainly relevant, it is insufficient, standing alone, to support a reasonable suspicion of criminal activity. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Officers must have some reasonable basis to warrant investigation; a mere "inchoate and unparticularized suspicion or 'hunch'" is not enough to generate reasonable suspicion. *Terry v. Ohio*, 392 U.S. 1, 27 (1995).

Looking objectively at the facts presented at the hearing, Agent Pate testified that he did not actually witness any evidence of criminal activity before stopping Defendant. He stopped Defendant because he pulled in front of and stopped at a known "crack house." The affidavit of complaint confirms as much, listing the reason for the stop as follows: "the way the vehicle pulled up to the home is consistent to the manner that other vehicles pull up to the home to drop off or pick up crack."

In our view, Defendant's act of stopping his vehicle outside a known crack house, without any additional evidence of criminal activity, is not enough to rise to reasonable suspicion to stop Defendant's vehicle. There was no testimony that Defendant in any way participated in a drug deal at the house, either minutes before the stop, or during the weeks of surveillance on the house prior to his arrest. There was no testimony that Defendant exited his vehicle while it was at the house or that another person came up to

the vehicle while it was parked at the house. Therefore, we conclude that Defendant was seized without any specific and articulable facts tying him to any illegal activity, in the past or at the present. *See, e.g.*, *State v. Nicholson*, 188 S.W.3d 649, 661 (Tenn. 2006) (holding the defendant's presence in an area being monitored for gang activity, where officers witnessed what they thought were drug transactions taking place, without more, did not amount to reasonable suspicion); *State v. Lawson*, 929 S.W.2d 406, 409 (Tenn. Crim. App. 1996) (finding vehicle's presence in a high crime area late at night was not sufficient to support reasonable suspicion); *State v. Dale E. Morrell*, No. 03-C01-9409-CR00355, 1996 WL 36120, at *4 (Tenn. Crim. App. Jan. 31, 1996) (determining mere hunch was not enough to stop the defendant for DUI); *State v. Herbert Lee Massey*, No. 01C01-9406-CR-00218, 1995 WL 518872, at *4-5 (Tenn. Crim. App. Sept. 5, 1995) (affirming the trial court's exclusion of evidence obtained as a result an investigatory stop where the trial court found that the only reason for the stop was the defendant's presence at night in a high crime area). The fact that Defendant was a known drug dealer is irrelevant to our consideration because Agent Pate testified that he was not even aware that it was Defendant driving the vehicle until he approached the vehicle and saw Defendant in the driver's seat. The stop was not objectively reasonable and the record does not support a finding of reasonable suspicion for the stop.

*Conclusion*

After our review, we conclude that the trial court erred in denying the motion to suppress. As a result, we reverse the judgment of the trial court, and dismiss Defendant's conviction.

_____
TIMOTHY L. EASTER, JUDGE