IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
August 6, 2019 Session

**STATE OF TENNESSEE v. BRIAN SHERRILL**

**Appeal from the Circuit Court for Lake County**
**No. 2017-CR-10349     R. Lee Moore, Jr., Judge**

_____

**No. W2019-00150-CCA-R3-CD**

_____

The State appeals the trial court's order granting the Defendant's, Brian Sherrill, motion to suppress evidence seized as a result of a warrantless search of his vehicle. The Defendant argued that the arresting officer lacked probable cause or reasonable suspicion to believe that his truck's brake light was malfunctioning. The State replied that the arresting officer had reasonable suspicion to stop the Defendant for either the brake light offense or an alleged seatbelt violation. The trial court addressed the brake light offense and concluded that the "totality of the circumstances" did not support the stop. After the trial court granted the Defendant's suppression motion and dismissed the indictment, the State appealed. Following our review, we conclude that the trial court erred by not considering the State's alternative theory attempting to establish that the stop was supported by reasonable suspicion of a seatbelt violation. Accordingly, we reverse the judgment of the trial court and remand the case for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Reversed; Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and NORMA MCGEE OGLE, J., joined.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; C. Phillip Bivens, District Attorney General; and Lance E. Webb, Assistant District Attorney General, for the appellant, State of Tennessee.

Hal James Boyd, Tiptonville, Tennessee, for the appellee, Brian Sherrill.

**OPINION**
FACTUAL BACKGROUND

At 11:18 p.m. on November 4, 2016, Lake County Sheriff's Deputy Nicholas Staggs conducted a traffic stop of the Defendant, who was driving a black, 1979 Chevrolet pick-up truck on Church Street in Tiptonville. In the affidavit of complaint, Deputy Staggs stated that he stopped the Defendant for having "a brake light out on the driver['s] side of the vehicle." Deputy Staggs further maintained that while he was waiting on the Defendant's driver's license check, a K-9 officer arrived on the scene. Thereafter, the dog indicated that contraband was present inside the Defendant's truck. Deputy Staggs said that the Defendant also gave permission to search. During the ensuing search, the officers found "a set of digital scales with residue, small zip baggies, medium zip baggies with the corners cut out," a glass pipe with residue, and methamphetamine in the approximate amount of 15 grams. The Defendant also had $120 on his person "all in small currency."

Following the warrantless search of the Defendant's automobile, the Lake County Grand Jury charged the Defendant with possession of 0.5 grams or more of methamphetamine with the intent to sell or deliver and possession of drug paraphernalia. See Tenn. Code Ann. §§ 39-17-408, -425. Thereafter, the Defendant filed a motion to suppress the evidence, alleging that the search violated the Fourth Amendment. The Defendant maintained that the K-9 officer's body camera footage, which captured much of the traffic stop, showed that both of the Defendant's brake lights were functioning properly and that, therefore, Deputy Staggs, lacked reasonable suspicion that the Defendant had committed a traffic offense. A hearing was held on April 23, 2018.

At this hearing, Charles Stewart testified that he ran an automobile repair shop and that he had worked on cars for approximately forty years. Mr. Stewart was qualified as an expert. According to Mr. Stewart, in his capacity as a mechanic, he had fixed brake lights that had been working sporadically due to electrical wiring issues. He explained, "It's possible they can overheat after you drive for a long period of time." Mr. Stewart was asked how a vehicle's brake light "might be working at one instance and five minutes later might not be working, or vice versa," to which he replied that an automobile with a light having "a bad connection where they plug in" "[c]ould have hit a bump." Mr. Stewart continued, "[T]he relay could have been overheated, and after it set [sic] a little bit it cooled off and then started back working."

Mr. Stewart indicated that the age of a vehicle, including the "relays, the wiring, [and] the bulbs," played a part in "how well" a brake light might be working at any specific time. Mr. Stewart observed that the Defendant's truck was about twenty years old or more at the time of the traffic stop. However, Mr. Stewart had not worked on the Defendant's truck and could not provide specific information regarding the condition of the Defendant's brake lights.

The body camera footage from the K-9 officer was admitted as an exhibit to the hearing. The trial court requested additional time to view the recording, so the hearing was reset for July 23, 2018.

Before the second hearing, the State filed a response to the Defendant's suppression motion. The State conceded that the body camera footage showed that both of the Defendant's brake lights were operational when Deputy Staggs got in the car to move the vehicle. However, the State noted that the body camera footage did not capture "any portion of the initial stop of the vehicle" and submitted that the video did "not in any way foreclose the possibility that the brake light was not working when it was observed by Deputy Staggs." The State indicated that Deputy Staggs would testify that the Defendant driver's side brake light was not working at the time of the stop and that he had observed it was not working when he saw the Defendant the previous evening. The State also noted Mr. Stewart's testimony that he had fixed vehicles with sporadically-working brake lights due to a faulty or loose connection and averred that the Defendant's brake light "had time to cool off in the night air" by the time it was moved by Deputy Staggs.

In addition, the State remarked that "when Deputy Staggs first passed the Defendant, he observed that the Defendant was not wearing a seat belt." The State concluded that Deputy Staggs had reasonable suspicion of a traffic offense to execute a stop of the Defendant's vehicle, believing either that the Defendant had violated Tennessee Code Annotated section 55-9-603 by failing to wear a seat belt or Tennessee Code Annotated section 55-9-402 due to his non-functioning brake light.

Deputy Staggs testified at the July 23, 2018 hearing. He affirmed that he stopped the Defendant at 11:18 p.m. on November 4, 2016.

Deputy Staggs testified that on the prior evening, he had also seen the Defendant's brake light not working. At that time, Deputy Staggs "was out in [his] front yard walking [his] dog" when he saw the Defendant "pull[] in a couple of houses down and let out a female." Deputy Staggs observed that "[w]hen [the Defendant] backed out and headed . . . back northbound on Algee Street, he got to the stop light and his driver's side brake light was out." However, Deputy Staggs was not on duty at that time.

On the evening in question, November 4, 2016, Deputy Staggs was on duty when he observed the Defendant's truck "coming toward [him]." According to Deputy Staggs, he was driving on Church Street near the liquor store and "had just come over the railroad tracks" when he spotted the Defendant. As the Defendant drove toward him, Deputy Staggs observed that "it didn't look like [the Defendant] was wearing a seatbelt." Deputy Staggs averred that this observation was the "only reason" why he "became interested" in the Defendant's vehicle and was why he turned around to follow the Defendant. In

addition, Deputy Staggs prepared a written report shortly after the traffic stop. After being shown the report, Deputy Staggs confirmed that he had included therein his observation of the Defendant's not wearing a seatbelt.

As Deputy Staggs started to follow the Defendant, he got the Defendant's license plate number "and ran it through dispatch." According to Deputy Staggs, when they "crossed over the railroad tracks," the Defendant slowed down, and he noticed that the Defendant's driver's side brake light was not working at that time. Deputy Staggs then conducted the traffic stop.

Deputy Staggs testified that during the stop, the drug dog "indicate[d] on the vehicle" and that the Defendant also gave consent to search. When the Defendant gave consent, the drug dog was already on the scene, according to Deputy Staggs. Deputy Staggs then detailed the items found inside the Defendant's truck.

On cross-examination, Deputy Staggs stated that he did not "believe" the Defendant was wearing a seatbelt when he first observed the Defendant. However, Deputy Staggs could not specifically recall whether the Defendant was in fact wearing a seatbelt. Deputy Staggs acknowledged that he did not issue the Defendant a citation for a seatbelt violation.[1] Deputy Staggs reiterated that the seatbelt violation was "the first thing for a real suspicion."

Deputy Staggs confirmed that he got inside the Defendant's truck to move it forward, claiming that he did so "to get it out of the mud hole." Deputy Staggs had not seen the body camera footage showing the Defendant's properly functioning driver's side brake light. Deputy Staggs affirmed that even if such was reflected on the recording, it was not working "at the time of the stop."

The trial court then inquired, "I need to know why the reason [sic] you made the stop." Deputy Staggs responded, "Brake lights. I spun around–I couldn't–It was dark, Your Honor. It appeared that he was not wearing a seatbelt and it caught my interest. As soon as he slowed down to go over the railroad tracks the brake light was out."

On redirect, Deputy Staggs testified that the seatbelt violation "[c]ould have" also provided him with reasonable suspicion to support the traffic stop. Deputy Staggs was asked, "If you . . . hadn't seen the brake light, were you going to stop him for the seatbelt violation anyway?" Deputy Staggs said, "Absolutely. At least to make sure he had it on."

---

[1] We note that the record presented does not indicate that the Defendant was issued a citation for the non-functioning brake light. The record shows that the Defendant was cited for driving on a suspended license and that the non-functioning brake light was referenced in that citation.

Thereafter, the trial court entered a written order granting the Defendant's suppression motion. Ultimately, the trial court concluded that "there was no basis for the original stop after viewing the totality of the circumstances surrounding this search and seizure."

In providing its rationale for its decision, the trial court first recounted Mr. Stewart's testimony that he "had situations where people complain of sporadic brake lights working on old vehicles if there [were] bad connections." The trial court then noted that Mr. Stewart had not looked at the Defendant's vehicle and could not give an opinion regarding whether the Defendant's brake "light was working or whether the brake light would work sometimes and not others."

The trial court then detailed its observations from reviewing the body camera footage. The trial court found, "In reviewing the DVD video, there were two occasions on which an officer started the truck[,] and it appeared that the brake light was working." The trial court provided specific facts from the recording supporting its conclusion.

Next, the trial court discussed Deputy Staggs's testimony. The trial court noted the following:

> The [c]ourt asked [Deputy Staggs] specifically the reason for the stop, and he stated because of the brake light. On redirect, he stated that the seatbelt could have been a reason to make the stop. He also stated that he would have stopped the truck on the seatbelt issue at least to see if he had it on.

Despite these remarks, the trial court determined, "It is clear from the testimony of Deputy Staggs that the actual stop was made because of the brake light situation."

In summation, the trial court noted that Deputy Staggs stated the basis for the stop was the non-functioning brake light, that the recording showed both brake lights in proper working order, and that Mr. Stewart could not provide any information about the Defendant's vehicle specifically. Consequently, without further addressing the seat belt violation, the trial court granted the Defendant's motion.

Thereafter, the trial court dismissed the indictment against the Defendant because, due to the suppression ruling, the State was "unable to proceed in its prosecution of the [D]efendant." The State filed a timely appeal, and the case is now before us for our review.

<u>ANALYSIS</u>

On appeal, the State argues that the trial court erred in granting the suppression motion "because the Defendant was not wearing his seat belt," which provided reasonable suspicion, and the arresting officer's subjective intent in stopping the Defendant was irrelevant. According to the State, the "facts established reasonable suspicion that an alternative traffic offense was taking place," and "the traffic stop was valid." In addition, the State, at oral argument, maintained that the trial court's recitation of Deputy Staggs's testimony in its suppression order amounted to an implicit accreditation of that testimony. Also, the State, citing to Fields v. State, 40 S.W.3d 450, 457 n.5 (Tenn. 2001), contended that even if there was no implicit accreditation of Deputy Staggs's testimony by the trial court, this court could review the facts in the record under a purely de novo standard without according any deference to the trial court.

The Defendant, on the contrary, submits that the trial court "either explicitly or implicitly determined that Deputy Staggs did not have sufficient reasonable suspicion under the totality of the circumstances" to initiate a traffic stop based upon a seatbelt violation. The Defendant notes that Deputy Staggs "had no recollection of the events" surrounding the seatbelt violation, that it was dark outside when Deputy Staggs first encountered the Defendant, that Deputy Staggs could not say whether the Defendant was in fact wearing his seatbelt, and that Deputy Staggs did not issue a citation for the seatbelt violation. The Defendant also cites to the trial court's finding that the malfunctioning brake light did not support the stop and avers that this finding is corroborated by the record.[2]

Alternatively, the Defendant contends that even if the stop was justified based upon an alleged seatbelt violation, "that does [not] provide sufficient constitutional justification for the vehicle search that followed several minutes later." The Defendant asserts that he "is entitled to the conclusion that Deputy Staggs made a determination not to proceed further with the seat belt violation." According to the Defendant, "[t]he video of this incident is clear that Deputy Staggs was not investigating a seat belt violation" and "that a K-9 drug detecting dog was not brought out immediately while the seatbelt investigation could have been the justification for the stop." The Defendant maintains that reasonable suspicion of a seatbelt violation would have only supported a brief investigatory stop—contrary to a probable cause stop for a brake light violation—and that "[t]he video clearly show[ed] the window for the hypothetical seatbelt stop had well and truly closed." The Defendant concludes, "Absent the brake light issue, Deputy Staggs should have allowed the Defendant to proceed on about his business because the reasons for the stop regarding the seatbelt are no longer justified."

---

[2] Without being explicit in their brief, the State seemingly acquiesces to the trial court's conclusion regarding the brake light offense. They do not address this ground in their appellate brief. At oral argument, the State acknowledged that it was not contesting the trial court's findings as it pertained to the malfunctioning brake light.

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." Id. Conversely, a trial court's conclusions of law, along with its application of the law to the facts, are reviewed de novo without any presumption of correctness. Id.

Both the federal and state constitutions offer protection from unreasonable searches and seizures with the general rule being "that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression." Talley, 307 S.W.3d at 729 (citing U.S. Const. amend. IV; Tenn. Const. art. I, § 7). As has often been repeated, "the most basic constitutional rule in this area is that 'searches [or seizures] conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment–subject to only a few specifically established and well delineated exceptions.'" Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)); see also State v. Berrios, 235 S.W.3d 99, 104 (Tenn. 2007).

"Individuals do not lose their constitutional protections against unreasonable searches and seizures by getting into an automobile." State v. Smith, 484 S.W.3d 393, 400 (Tenn. 2016). However, if the officer has probable cause or a reasonable suspicion to suspect that a motorist has committed a traffic offense, a traffic stop will "pass constitutional muster." Id. 400-02. In reviewing whether an officer had probable cause or a reasonable suspicion to stop a motorist, "the officer's subjective state of mind is irrelevant." Id. at 402. Rather, courts review the validity of a traffic stop "from a purely objective perspective" and "may consider relevant circumstances demonstrated by the proof even if not articulated by the testifying officer as reasons for the stop." Id. When opposing a defendant's suppression motion, the State "is not limited . . . to the grounds ostensibly relied upon by the officer if the proof supports the stop on other grounds." Id.

From the written order, the trial court appears to have based its suppression ruling upon Deputy Staggs's subjective reason for the stop, i.e., the brake light violation under Code section 55-9-402. The trial court did not further address the alleged seatbelt offense pursuant to Code section 55-9-603. Based upon the foregoing, we conclude that the trial court erred by failing to consider the State's alternative theory that the Defendant's possible seatbelt violation provided reasonable suspicion to justify a brief investigatory

-7-

detention.  See, e.g., State v. Horatio Lamont Harrison, No. W2017-01798-CCA-R3-CD, 2019 WL 328683, at *2 (Tenn. Crim. App. Jan. 23, 2019) (determining that "the trial court erred in not allowing the State to present its alternative theory that the [d]efendant's crossing of the fog line violated [Code] section 55-8-123 and provided probable cause or a reasonable suspicion to justify the traffic stop").

At the hearing, Deputy Staggs testified that when he first encountered the Defendant driving toward him on Church Street, it appeared that the Defendant was not wearing a seatbelt, although it was dark outside.  According to Deputy Staggs, the possible seatbelt offense was the "only reason" why he initially "became interested" in the Defendant's vehicle and why he turned around to follow the Defendant.  This was his "first thing for a real suspicion," according to Deputy Staggs.  Deputy Staggs testified that he "[a]bsolutely" would have stopped the Defendant regardless of the non-functioning brake light to see if the Defendant was in fact wearing his seatbelt.  Moreover, while Deputy Staggs could not recall the precise details of the alleged seatbelt violation, he was presented with his written report prepared shortly after the incident wherein he noted his observation that the Defendant was not wearing a seatbelt.  In addition, we observe that even though the Defendant was not issued a citation for the seatbelt violation, it likewise does not appear from the record that he was cited for the non-functioning brake light but only for driving on a suspended license.

We decline the State's invitation to find that the trial court implicitly accredited Deputy Staggs's testimony regarding the seatbelt violation.  We likewise reject the Defendant's invitation to conclude that the trial court "either explicitly or implicitly determined that Deputy Staggs did not have sufficient reasonable suspicion under the totality of the circumstances" to initiate a traffic stop based upon a seatbelt violation.  We do not believe either interpretation to be apparent or implied from the trial court's written order.  The trial court in its order merely recounted Deputy Staggs's testimony at the suppression before addressing Deputy Staggs's subjective reason for the stop, that being the brake light violation.  The trial court did not make any factual findings on the State's alternative theory, including whether Deputy Staggs was credible regarding his observations surrounding the alleged seatbelt offense.  Although not explicitly stated, the trial court seemingly took issue with Deputy Staggs's testimony surrounding the malfunctioning brake light.  Moreover, the trial court also did not make any conclusions of law, such as whether any reasonable suspicion of a seatbelt violation was supported by specific and articulable facts.

The State cites to Fields, 40 S.W.3d at 457 n.5, for the proposition that even if there was no implicit accreditation of Deputy Staggs's testimony by the trial court, this court could review the facts in the record under a purely de novo standard without according any deference to the trial court and, thus, make its own determination

regarding whether the stop was supported by reasonable suspicion of a seatbelt violation. In Fields, our supreme court addressed language in State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999), and indicated that they, by such language, "certainly intended no departure from the standard as followed in all of [their] previously issued decisions[,]" i.e., requiring deference to the trial court's findings of fact unless the evidence in the record preponderates against those findings. See 40 S.W.3d at 457. The Fields court then stated the following: "While we did not specifically state in Burns that the trial court's findings of fact are entitled to a presumption of correctness, we did not expressly omit the presumption as would have been expected or as we have done in other cases." The Fields court then cited the holding of State v. Binnette, 33 S.W.3d 215, 217 (Tenn. 2000): "Accordingly, we hold that when a trial court's findings of fact at a suppression hearing are based on evidence that does not involve issues of credibility, a reviewing court must examine the record de novo without a presumption of correctness." 40 S.W.3d at 457. This citation was followed by footnote five of Fields, wherein our supreme court merely noted that "in very limited circumstances," "an appellate court could . . . review the facts in the record under a purely de novo review without according any deference to the trial court." Id. at n.5. Examples of such circumstances were provided. However, our supreme court thereafter reiterated, "[O]ur language in Burns should not be read as eliminating the presumption of correctness accorded a trial court's factual findings as required by the Rules of Appellate Procedure." Id. at 457.

None of those "very limited circumstances" listed in footnote five of Fields are present here. Because Deputy Staggs's credibility is at issue here, and because questions of credibility are a matter entrusted to the trial court, see Odom, 928 S.W.2d at 23, we believe it is necessary to reverse the judgment of the trial court and remand the case for a new suppression hearing. See State v. Alberts, 354 S.W.3d 320, 321-23 (Tenn. Crim. App. 2011) (remanding for a new suppression hearing when the trial court failed to consider "an alternative theory" that a search was valid as a warrantless search); see also Harrison, 2019 WL 328683.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is reversed. The case is remanded for further proceedings consistent with this opinion.

_____
D. KELLY THOMAS, JR., JUDGE