IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
April 1, 2025 Session

## STATE OF TENNESSEE v. VALERIE GARRETT

**Appeal from the Circuit Court for Madison County**
**No. 23-208   Joseph T. Howell, Judge**

_____

**No. W2024-00262-CCA-R3-CD**

_____

Defendant, Valerie Garrett, was convicted following a bench trial of driving under the influence ("DUI"), third offense, and failure to maintain lane of travel. Defendant claims that the deputy who arrested her lacked reasonable suspicion for the traffic stop and that the trial court erred by failing to suppress the evidence obtained as a result of the stop. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which TOM GREENHOLTZ and KYLE A. HIXSON, JJ., joined.

Harold E. Dorsey, Trenton, Tennessee, for the appellant, Valerie Garrett.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; J. Katie Neff, Assistant Attorney General; Jody Pickens, District Attorney General; and Allison P. Martin, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On September 6, 2022, Madison County Sheriff's Office (MCSO) Deputy Jacob Nickell[1] arrested Defendant for DUI and failure to maintain lane. Defendant was subsequently indicted by the Madison County Grand Jury for DUI, third offense, and

---

[1] Deputy Nickell's name is spelled Nichol in the trial transcript. His name is spelled Nickell in the arrest warrant, the indictment, and the transcript of the suppression hearing. We will use the name in the indictment.

failure to maintain lane. The trial court held a suppression hearing after Defendant moved to suppress evidence obtained from the traffic stop.

## Suppression Hearing

Deputy Nickell testified that at approximately 2:53 a.m. on September 6, 2022, he observed a Chevrolet Camaro ("Camaro") traveling southbound in the left-hand lane on Hollywood Boulevard in Jackson. He said he observed the Camaro cross the "centerline" two times and then cross "the segmented line" while making a left turn onto North Parkway. At that point, Deputy Nickell activated his blue lights and stopped Defendant. The dashcam video ("the video") from Deputy Nickell's vehicle was entered as Exhibit 1.

The following dialogue occurred after defense counsel was permitted to question Deputy Nickell before the video was played:

> [DEFENSE COUNSEL]: I'm sitting here reading your report. You don't say anything in your report -- you say in your report that she crossed the centerline two times, and that's why you stopped her. Is that right?
>
> [DEPUTY NICKELL]: Yes, sir.
>
> [DEFENSE COUNSEL]: I mean, it didn't -- you didn't -- the stop wasn't based on anything that she did in the turn. You had already seized her at that point, hadn't you? Hadn't you already blue lighted her?
>
> [DEPUTY NICKELL]: No, sir. I don't believe my blue lights were on at that point.
>
> [DEFENSE COUNSEL]: Yeah, but I'm sitting here looking at your report. You don't say anything about her doing something wrong when she was making the turn. You say you initiated the traffic stop because she crossed the centerline two times?
>
> [DEPUTY NICKELL]: Yes, sir. My charge that I had against her, my traffic charge that I had for the probable cause for the stop was based on failure to maintain lane. In so doing, when she made that turn, it was also failure to maintain lane, so, since I already had a failure to maintain lane charge, I just didn't include that in the report. I mean, the video speaks for itself. I stand on the video as far as whether or not that event occurred.

[TRIAL] COURT: [Defense counsel], we will save that for cross-examination. Go ahead, General.

On further direct examination, Deputy Nickell stated that he believed that he activated his vehicle's blue lights after Defendant's vehicle turned onto North Parkway.

The video was then played while Deputy Nickell identified the times in the video in which he said Defendant crossed the centerline. The trial court noted that the first time Deputy Nickell said Defendant crossed the centerline was at 0:26 seconds. Deputy Nickell identified the second time he said she crossed the centerline was when he "had just gone into that curve," and the prosecutor said that it was at 0:52 seconds. Concerning the turn onto North Parkway, Deputy Nickell stated that Defendant "cut too sharp of a turn, which is consistent with the behavior of an intoxicated driver, and [she] then crossed over into a portion of the roadway which is not meant for travel."

On cross-examination, defense counsel questioned Deputy Nickell about his report, which stated in part, "I observed the vehicle to cross the centerline two times. I then initiated . . . a traffic stop on the vehicle, which came to a rest on Bayberry and North Parkway." The following dialogue then occurred:

[DEFENSE COUNSEL]: That's fine right there. So, your reasonable suspicion was the two times that you claim the car drove over the centerline. Correct?

[DEPUTY NICKELL]: No, sir. The probable cause for which I stopped the vehicle was the failure to maintain lane, which included the crossing over the centerline as well as there was the event -- and the turn. It crossed over too -- it crossed too sharply into the no-driving section.

[DEFENSE COUNSEL]: Why didn't you put what happened in the turn in your report, then, [Deputy] Nickell?

[DEPUTY NICKELL]: Because at that point, I had already -- I was only going to charge [Defendant] with failure to maintain lane. Because I had already witnessed events that justified the failure to maintain lane charge, I did not include the additional factor of the failure to maintain lane being that it would have been the exact same charge.

[DEFENSE COUNSEL]: You made up your mind you were going to stop her on these two perceived crosses over the centerline. Correct?

- 3 -

[DEPUTY NICKELL]: Not necessarily, no, sir. It was the - the crossing the line was definitely a big - was a portion of it, yes.

[DEFENSE COUNSEL]: You are saying that you didn't make up your mind to stop her until the turn?

[DEPUTY NICKELL]: Until the turn was completed or...

[DEFENSE COUNSEL]: Until the turn. Just my question.

[DEPUTY NICKELL]: Yes, sir. I was going to stop the vehicle based upon the lane violations, the crossing that centerline, and then –

[DEFENSE COUNSEL]: So, the reasonable suspicion/probable cause that you put in your report is the reason why you stopped the vehicle. Correct?

[DEPUTY NICKELL]: No, sir. The probable cause for which stopped the vehicle was the crossing over the centerline multiple times. And then, in addition to that, there was also . . . the turn.

[DEFENSE COUNSEL]: But before she turned -- you had your mind made up you were going to stop her before she turned onto North Parkway. Correct?

[DEPUTY NICKELL]: Before the turn was completed, yes.

At the conclusion of the hearing, the trial court found that "considering Deputy Nickell's testimony and reviewing the exhibits presented today, it does appear that [D]efendant did cross, albeit not terribly bad, but did cross the center line" and denied the motion to suppress.

## Bench Trial

Defendant waived a jury and proceeded to a bench trial. Because the sole issue on appeal relates to whether Deputy Nickell had reasonable suspicion or probable cause to stop Defendant, we will limit our review to the testimony and evidence presented at the trial to the events that occurred at or before the time Deputy Nickell activated his vehicle's blue lights and seized Defendant and to testimony concerning Deputy Nickell's training and experience. *See generally State v. McKinney*, 669 S.W.3d 753, 764 (Tenn. 2023) (stating that, "[i]n evaluating the correctness of a trial court's ruling on a pretrial motion to

- 4 -

suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial") (quoting *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998)).

The State called Deputy Nickell who testified that he had been a deputy with the MCSO for eight years and that he had attended "the DUI class including a wet lab at the basic academy" and "a DUI detection and standardized field sobriety tests class." He said that he "also attended an advanced roadside impaired driver enforcement class" and that, during the current year, he "conducted an in-service of eight hours . . . for DUI detection." His testimony concerning the events that led to the traffic stop was consistent with his testimony at the suppression hearing, although he said Defendant crossed the centerline "two or three times" rather than two times. He also said Marcus Garrett was a front-seat passenger in the vehicle when he conducted the stop.

During cross-examination, defense counsel questioned Deputy Nickell about the report he prepared within hours of the arrest.

> [DEFENSE COUNSEL]: The entire basis for stopping [Defendant] was you claimed that she crossed over the yellow line two times after she left The Tap Bar & Grill where you picked her up and followed her. You say she crossed over the yellow line two times, correct?
>
> [DEPUTY NICKELL]: No, sir. I don't recall exactly where I initially observed her vehicle when it was at The Tap or leaving The Tap or not. Where I began to take notice for sure was when we were traveling on Hollywood Boulevard. I was traveling southbound. But, no, the stop itself, the crossing over the line -- But then also after that left-hand turn was made when she turned onto North Parkway, she had not yet been seized, and she crossed over the lines. This is lines that are marked off on the North Parkway section where no vehicles are supposed to be driving. She crossed over the center line on that.
>
> [DEFENSE COUNSEL]: All of your probable cause is on the [video], correct?
>
> [DEPUTY NICKELL]: Yes, sir.

The trial court ultimately concluded that Defendant "did cross over the lines in violation" of Tennessee Code Annotated section 55-8-123 and found Defendant guilty of failure to maintain lane of travel and DUI, third offense.

Defendant timely appealed.

- 5 -

**Analysis**

Defendant claims that the video does not show that she crossed the line separating the left-hand through lane from the center two-way turn lane while driving southbound on Hollywood Boulevard and that slightly crossing the diagonal cross-hatched area while turning left onto North Parkway did not provide a reasonable suspicion for the traffic stop. Defendant asserts, therefore, that the trial court erred in not suppressing the evidence seized from the stop. The State argues that Deputy Nickell had probable cause to stop Defendant for failure to maintain her lane of travel and reasonable suspicion to stop the vehicle to investigate whether she was driving under the influence.

*Standard of Review*

This case involves a review of the trial court's findings of fact and conclusions of law in denying a motion to suppress evidence. Whether Defendant failed to maintain her lane of travel is an issue of fact. This court is bound by the trial court's findings of fact on the credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence unless the evidence preponderates otherwise. *State v. Davidson*, 509 S.W.3d 156, 182 (Tenn. 2016); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Additionally, this court affords the party prevailing in the trial court "the strongest legitimate view of the evidence and all reasonable and legitimate inferences drawn from that evidence." *State v. Carter*, 160 S.W.3d 526, 531 (Tenn. 2005) (citing *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001)). Whether the facts provided probable cause or reasonable suspicion for a law enforcement officer to perform a traffic stop is a conclusion of law conducted under a de novo standard of review with no presumption of correctness. *See State v. McKinney*, 669 S.W.3d 753, 764 (Tenn. 2023); *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012); *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001).

*Probable Cause and Reasonable Suspicion*

The Fourth Amendment to the United States Constitution and Article I, Section 7 of the Tennessee Constitution prohibits unreasonable searches and seizures. Traffic stops "constitute seizures entitling a vehicle's occupants to the full protections of the United States and Tennessee Constitutions[.]" *State v. Brotherton*, 323 S.W.3d 866, 870 (Tenn. 2010) (internal citations omitted). A warrantless seizure "is presumed unreasonable and evidence seized thereby is subject to suppression, unless the State establishes one of the recognized exceptions to the warrant requirement." *State v. Dotson*, 450 S.W.3d 1, 50 (Tenn. 2014) (citing *State v. Bishop*, 431 S.W.3d 22, 36 (Tenn. 2014)). One recognized exception exists when an officer at the time of the seizure has probable cause to believe that the defendant had committed or was committing a criminal offense. *Echols*, 382 S.W.3d at 277-78. "[T]he determination of probable cause involves an objective

assessment of the facts and circumstances within the knowledge of the officers. *State v. Reynolds*, 504 S.W.3d 283, 303 (Tenn. 2016).

Another recognized exception to the warrant requirement "exists when a police officer makes an investigatory stop based upon reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000) (citing *Terry v. Ohio*, 392 U.S. 1, 20-21 (1968); *State v. Bridges*, 963 S.W.2d 487, 492 (Tenn. 1997)). "Determining whether reasonable suspicion exists in a particular traffic stop is a fact-intensive and objective analysis." *State v. Day*, 263 S.W.3d 891, 903 (Tenn. 2008). "'[R]easonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause' and 'can arise from information that is less reliable than that required to show probable cause.'" *State v. Hanning*, 296 S.W.3d 44, 49 (Tenn. 2009) (quoting *Day*, 263 S.W.3d at 903).

### *Maintaining Lane of Travel*

Tennessee Code Annotated Title 55, Chapter 8, Part 1 provides "Rules for the Road" for the operation of vehicles. Code section 55-8-123(1) provides:

> Whenever any roadway has been divided into two (2) or more clearly marked lanes for traffic, the following rules, in addition to all others consistent with this section, shall apply:
>
> (1) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from that lane until the driver has first ascertained that the movement can be made with safety[.]

Tenn. Code Ann. § 55-8-123(1) (2022). A violation of section 55-8-123(1) is a Class C misdemeanor and, therefore, a criminal offense. Tenn. Code Ann. § 55-8-103 (2022). Our supreme court has held that Section 55-8-123(1)

> is violated when a motorist strays outside of [the motorist's] lane of travel when *either* (1) it is practicable for [the motorist] to remain in [the motorist's] lane of travel *or* (2) [the motorist] fails to first ascertain that the maneuver can be made with safety. Thus, even minor lane excursions may establish a violation of Section 123(1) whether or not the excursion creates a specific, observed danger.

*State v. Smith*, 484 S.W.3d 393, 408 (Tenn. 2016) (citations and footnote omitted) (emphasis in original). The supreme court in *Smith* cautioned that "in many cases it will

not be possible for an observing officer to discern either the reason for a driver's leaving [the driver's] lane of travel or whether [the driver] first ascertained the safety of the maneuver" and that, in such cases, "the officer would have to investigate further in order to determine whether the driving maneuver violated Section 123(1)." *Id.* at 410.

### *The Video*

We have viewed the first one minute and eighteen seconds of the video recorded before Deputy Nickell activated the blue lights on his patrol car. The entirety of Defendant's driving which Deputy Nickell testified formed the basis for the traffic stop is shown on the video. This court is "[e]qually as capable as the trial court of reviewing" the video. *Binette*, 33 S.W.3d at 219.

On the video, we can determine that Hollywood Boulevard is a five-lane highway consisting of four through lanes and a center two-way turn lane ("center turn lane"). For most of the video, the outside through lane in both directions is marked with a single solid white edge (fog) line, and the two through lanes in each direction are divided by a single broken white line. The center turn lane is separated from the inside through lane in both directions by a solid yellow line on the outside with a broken yellow line on the inside of the solid line. Hollywood Boulevard appears to be generally straight, and the topography is relatively flat. It is night, the weather is clear, and traffic is sparse with only two oncoming vehicles heading north and passing Defendant. The taillights of one or two vehicles can be seen in the distance heading in the same direction as Defendant.

On the video, we can determine that North Parkway is also a five-lane highway with two through lanes in each direction and a center turn lane. However, for a short distance at the intersection with Hollywood Boulevard, the center turn lane of North Parkway is marked with solid yellow lines on both sides and yellow diagonal cross-hatched lines, indicating an area where driving is prohibited and indicating the lane is not to be used to turn left from North Parkway onto Hollywood Boulevard. The double solid yellow lines are curved at the intersection indicating the turn radius that a vehicle turning left from the center turn lane of Hollywood Boulevard should follow while turning onto North Parkway. The yellow diagonal cross-hatched markings continue for approximately three or four car lengths from the intersection of Hollywood Boulevard before the center lane is marked as a two-way turn lane.

The video displays a timer that begins at 0:00 (zero seconds) with Deputy Nickell's vehicle slowly approaching an unidentified white sport utility vehicle ("SUV") stopped at a red light in the right-hand, southbound lane of Hollywood Boulevard. Defendant's Camaro is stopped at the light in the left-hand southbound lane beside the SUV. When the light turns green, both vehicles begin to move forward at what appears to be a normal

speed. There is no proof that Defendant's vehicle exceeds the speed limit. The SUV activated its right turn signal at 47 seconds, and Deputy Nickell began to move to the left-hand lane. By approximately 56 seconds, Deputy Nickell was in the left-hand lane directly behind Defendant. As a result of the location of Deputy Nickell's vehicle in relation to Defendant's vehicle, the first 56 seconds of the video were taken at an angle from several car lengths behind Defendant.

For most of the video, Defendant can be seen driving close to the solid yellow line separating the left-hand southbound lane from the center turn lane. At approximately 28 seconds, Defendant's vehicle drifts to the left and her driver side tires go onto the solid yellow line and the broken yellow line separating the center turn lane from the inside through lane. Her vehicle's driver side tires remain on the solid yellow line and the broken yellow line until approximately 34 seconds, when she drifts to the right toward, but not touching, the broken white line dividing the southbound lanes. At approximately 48 seconds, Defendant's vehicle drifts to the left and her driver side tires again go onto the solid yellow line and the broken yellow line. Her vehicle's driver side tires remain on the solid yellow line and the broken yellow line until approximately 52 seconds.

At approximately 56 seconds, Defendant activated her left turn signal and began to move into the center turn lane. The traffic light on Hollywood Boulevard is green and no oncoming traffic is visible. At one minute, twelve seconds, Defendant began a left-hand turn onto North Parkway. The driver side tires of Defendant's vehicle slightly cross the diagonal cross-hatched area as she makes the left-hand turn. Deputy Nickell activated his blue lights at one minute, eighteen seconds, effectively seizing Defendant as she was reentering the diagonal cross-hatched area so that she could turn left onto a side street. There was approximately a one-car-length distance from where the diagonal cross-hatched area ended to where the side street connected to North Parkway. Defendant completed the turn and stopped promptly on the side street.

Deputy Nickell testified at the suppression hearing and at the bench trial that he observed Defendant's driver side tires cross the lines separating the left-hand through lane from the center turn lane on two occasions. Deputy Nickell also stated that Defendant "cut too sharp of a turn" causing her to cross into the cross-hatched area of North Parkway. Deputy Nickell stated that he conducted the traffic stop because he had probable cause that the driver of the Camaro failed to maintain the lane of travel and reasonable suspicion to perform an investigatory stop to determine if the driver's ability to drive was impaired. Implicitly accrediting Deputy Nickell's testimony and based on the video, the trial court found that Defendant "did cross over the lines in violation" of Tennessee Code Annotated section 55-8-123(1).

- 9 -

Because of the angle from which the video was taken, we cannot definitively determine that the driver side tires of Defendant's vehicle crossed over the solid yellow line and the broken yellow line. For the same reason, we determine that the video does not definitively refute Deputy Nickell's testimony, nor does it preponderate against the trial court's finding that Defendant crossed the centerline two times. Therefore, the trial court's findings of fact are binding on this court.

The totality of the circumstances and the accredited testimony of Deputy Nickell are sufficient to show that Deputy Nickell possessed probable cause that Defendant violated Tennessee Code Annotated section 55-8-123(1) by failing to maintain her lane of travel when it was practicable for her to do so.

Deputy Nickell also had a "reasonable suspicion, supported by specific and articulable facts" to conduct an investigatory traffic stop to determine if Defendant was operating a vehicle while her ability to drive was impaired. *See Smith*, 484 S.W.3d at 401 (quoting *Binette*, 33 S.W.3d at 218); Tenn. Code Ann. § 55-10-401 (stating that it is unlawful for any person to drive on a public road while "[u]nder the influence of any intoxicant . . . that impairs the driver's ability to safely operate a motor vehicle"); *See State v. Patterson*, No. M2010-02360-CCA-R3-CD, 2011 WL 3668845, at *3 (Tenn. Crim. App. Aug. 22, 2011), *no perm. app. filed*, (holding lack of definitive video proof that the defendant crossed the line marking the lane of travel due to the low lighting and the angles from which the video was recorded, does not preponderate against the trial court's ruling that the officer, whose testimony that the defendant crossed the line was accredited, had reasonable suspicion to stop the defendant).

## Conclusion

The judgments of the trial court are affirmed.

s/*Robert L. Holloway, Jr.*

ROBERT L. HOLLOWAY, JR., JUDGE